## MARTIN *v.* CITY OF STRUTHERS.

No. 238.   Argued March 11, 1943.—Decided May 3, 1943.

*Mr. Hayden C. Covington,* with whom *Mr. Victor F. Schmidt* was on the brief, for appellant.

*Messrs. David C. Haynes* and *T. T. Macejko* for appellee.

*Miss Dorothy Kenyon* filed a brief on behalf of the American Civil Liberties Union, as *amicus curiae,* urging reversal.

MR. JUSTICE BLACK delivered the opinion of the Court.

For centuries it has been a common practice in this and other countries for persons not specifically invited to go from home to home and knock on doors or ring doorbells to communicate ideas to the occupants or to invite them to political, religious, or other kinds of public meetings.   Whether such visiting shall be permitted has in general been deemed to depend upon the will of the individual master of each household, and not upon the determination of the community.   In the instant case, the City of Struthers, Ohio, has attempted to make this decision for all its inhabitants.   The question to be decided is whether the City, consistently with the federal Con-

stitution's guarantee of free speech and press, possesses this power.[1]

The appellant, espousing a religious cause in which she was interested—that of the Jehovah's Witnesses—went to the homes of strangers, knocking on doors and ringing doorbells in order to distribute to the inmates of the homes leaflets advertising a religious meeting. In doing so, she proceeded in a conventional and orderly fashion. For delivering a leaflet to the inmate of a home, she was convicted in the Mayor's Court and was fined $10.00 on a charge of violating the following City ordinance:

"It is unlawful for any person distributing handbills, circulars or other advertisements to ring the door bell, sound the door knocker, or otherwise summon the inmate or inmates of any residence to the door for the purpose of receiving such handbills, circulars or other advertisements they or any person with them may be distributing."

The appellant admitted knocking at the door for the purpose of delivering the invitation, but seasonably urged in the lower Ohio state court that the ordinance as construed and applied was beyond the power of the State because in violation of the right of freedom of press and religion as guaranteed by the First and Fourteenth Amendments.[2]

---

[1] This ordinance was not directed solely at commercial advertising. Cf. *Valentine* v. *Chrestensen*, 316 U. S. 52; *Green River* v. *Fuller Brush Co.*, 65 F. 2d 112. Compare for possible different results under state constitutions *Prior* v. *White*, 132 Fla. 1, 180 So. 347; *Orangeburg* v. *Farmer*, 181 S. C. 143, 186 S. E. 783.

[2] The appellant's judgment of conviction was appealed to the Supreme Court of Ohio which dismissed the appeal on the stated ground that: "No debatable constitutional question is involved." 139 Ohio St. 372, 40 N. E. 2d 154. We at first dismissed the appeal, thinking that the Supreme Court of Ohio meant that no constitutional question had been properly raised in accordance with Ohio procedure. Upon reconsideration we concluded that, since a constitutional question had been presented in the lower state court, the language of the Order of

The right of freedom of speech and press has broad scope. The authors of the First Amendment knew that novel and unconventional ideas might disturb the complacent, but they chose to encourage a freedom which they believed essential if vigorous enlightenment was ever to triumph over slothful ignorance.[3] This freedom embraces the right to distribute literature, *Lovell* v. *Griffin*, 303 U. S. 444, 452, and necessarily protects the right to receive it. The privilege may not be withdrawn even if it creates the minor nuisance for a community of cleaning litter from its streets. *Schneider* v. *State*, 308 U. S. 147, 162. Yet the peace, good order, and comfort of the community may imperatively require regulation of the time, place and manner of distribution. *Cantwell* v. *Connecticut*, 310 U. S. 296, 304. No one supposes, for example, that a city need permit a man with a communicable disease to distribute leaflets on the street or to homes, or that the First Amendment prohibits a state from preventing the distribution of leaflets in a church against the will of the church authorities.

We are faced in the instant case with the necessity of weighing the conflicting interests of the appellant in the civil rights she claims, as well as the right of the individual householder to determine whether he is willing to receive her message, against the interest of the community which by this ordinance offers to protect the interests of all of its citizens, whether particular citizens want that protection or not. The ordinance does not control anything but the distribution of literature, and in that re-

---

the Supreme Court of Ohio should be construed as a decision upon the constitutional question.

[3] "The only security of all is in a free press. The force of public opinion cannot be resisted, when permitted freely to be expressed. The agitation it produces must be submitted to. It is necessary to keep the waters pure." Jefferson to Lafayette, Writings of Thomas Jefferson, Washington ed., v. 7, p. 325.

spect it substitutes the judgment of the community for the judgment of the individual householder. It submits the distributer to criminal punishment for annoying the person on whom he calls, even though the recipient of the literature distributed is in fact glad to receive it. In considering legislation which thus limits the dissemination of knowledge, we must "be astute to examine the effect of the challenged legislation" and must "weigh the circumstances and . . . appraise the substantiality of the reasons advanced in support of the regulation." *Schneider* v. *State, supra,* 161.

Ordinances of the sort now before us may be aimed at the protection of the householders from annoyance, including intrusion upon the hours of rest, and at the prevention of crime. Constant callers, whether selling pots or distributing leaflets, may lessen the peaceful enjoyment of a home as much as a neighborhood glue factory or railroad yard which zoning ordinances may prohibit. In the instant case, for example, it is clear from the record that the householder to whom the appellant gave the leaflet which led to her arrest was more irritated than pleased with her visitor. The City, which is an industrial community most of whose residents are engaged in the iron and steel industry,[4] has vigorously argued that its inhabitants frequently work on swing shifts, working nights and sleeping days so that casual bell pushers might seriously interfere with the hours of sleep although they call at high noon. In addition, burglars frequently pose as canvassers, either in order that they may have a pretense to discover whether a house is empty and hence ripe for burglary, or for the purpose of spying out the premises in order that they may return later.[5] Crime prevention may thus be the purpose of regulatory ordinances.

---

[4] 16th Census, "Population—2d Series—Ohio," 133, 151.

[5] For a discussion of such practices, see Soderman and O'Connell, Modern Criminal Investigation, chap. 13 and chap. 20; Federal Bu-

While door to door distributers of literature may be either a nuisance or a blind for criminal activities, they may also be useful members of society engaged in the dissemination of ideas in accordance with the best tradition of free discussion. The widespread use of this method of communication by many groups espousing various causes attests its major importance. "Pamphlets have proved most effective instruments in the dissemination of opinion. And perhaps the most effective way of bringing them to the notice of individuals is their distribution at the homes of the people." *Schneider* v. *State, supra,* 164. Many of our most widely established religious organizations have used this method of disseminating their doctrines,[6] and laboring groups have used it in recruiting

reau of Investigation Law Enforcement Bulletin, July, 1938; 20 Public Management 83 (an analysis of the criminal records of a group of canvassers in Winnetka, Illinois). Sacramento, California, has rested a canvassing ordinance on crime prevention, *In re Hartmann,* 25 Cal. App. 2d 55, 76 P. 2d 709, and courts have been aware of this aspect of the problem in dealing with such ordinances. *Allen* v. *McGovern,* 12 N. J. Misc. 12, 13, 169 A. 345; *Dziatkiewicz* v. *Maplewood,* 115 N. J. L. 37, 178 A. 205.

[6] Representatives of the American Tract Society, an interdenominational organization engaged in colportage since 1841, have visited over twenty-five million families. Article on "American Tract Society," 1 Encyclopedia Americana (1932 ed.) 566; Annual Reports of the American Tract Society (e. g., the 116th Report, 1941, 37–38; 117th Report, 1942, pp. 37–38); Baird, Religion in America (1856), 334–340.

See also the activities of the American Bible Society. Jones, Colportage Sketches (1883); Dwight, The Centennial History of the American Bible Society (1916), 177–81, 293–95, 460; Annual Reports of the American Bible Society (e. g., 126th Report, 1942, *passim*).

For the world-wide colportage activities of the British and Foreign Bible Society, see the Society's 137th Report, 1941, *passim;* For Wayfaring Men (1939), 31–78; Ritson, The World Is Our Parish (1939), 116–18.

This practice has been followed by many religious groups. See, e. g., Barnes, Barnes and Stephenson, Pioneers of Light (1924), 81–

146

their members.[7]   The federal government, in its current war bond selling campaign, encourages groups of citizens to distribute advertisements and circulars from house to house.[8]   Of course, as every person acquainted with political life knows, door to door campaigning is one of the most accepted techniques of seeking popular support, while the circulation of nominating papers would be greatly handicapped if they could not be taken to the citizens in their homes.[9]   Door to door distribution of circulars is essential to the poorly financed causes of little people.

Freedom to distribute information to every citizen wherever he desires to receive it is so clearly vital to the

104; Stevens, The First Hundred Years of the American Baptist Publication Society (1925), 30–32.   During the fiscal year 1939–1940, representatives of the American Baptist Publication Society visited 52,832 families.   More than six million families have been visited over a one hundred year period.   Annual of Northern Baptist Convention, 1940, 671, 673; Year Book of the Northern Baptist Convention, 1942, 332–335.   See for the practice of other religions, Stewart, Sheldon Jackson (1908), 32; Goodykoontz, Home Missions on the American Frontier (1939), 120–122; Keller, The Second Great Awakening in Connecticut (1942), 117–121.

[7] Lorwin and Flexner, The American Federation of Labor, 352; International Ladies Garment Workers Union, Handbook of Trade Union Methods, 10; Brooks, When Labor Organizes, chap. 1 ("Organizing a Union").

[8] "Women's Handbook," pp. 22 and 63, a publication of the Women's Section of the War Savings Staff of the Department of the Treasury; The Home Front Journal, April, 1943, p. 1, a publication of the same group; "A Program of Action for Clubs," p. 3, a publication of the Department of the Treasury.   Presumably a citizen of Struthers distributing to homes the pamphlets recommended in "A Program of Action" would violate the City's ordinance.

[9] Merriam and Gosnell, The American Party System, 317 (The Canvass); Bruce, American Parties and Politics, 407; Ostogoskii, Democracy, 153–155, 453; Pierson, In the Brush, 142 (politics in the old Southwest); Barnes, The Antislavery Impulse, 137–143 (circulation of antislavery petitions).   The American Politician, ed. by J. T. Salter, 19, 235, 310, 339, and The American Political Scene, ed. by

preservation of a free society that, putting aside reasonable police and health regulations of time and manner of distribution, it must be fully preserved.  The dangers of distribution can so easily be controlled by traditional legal methods, leaving to each householder the full right to decide whether he will receive strangers as visitors, that stringent prohibition can serve no purpose but that forbidden by the Constitution, the naked restriction of the dissemination of ideas.

Traditionally the American law punishes persons who enter onto the property of another after having been warned by the owner to keep off.  General trespass after warning statutes exist in at least twenty states,[10] while similar statutes of narrower scope are on the books of at least twelve states more.[11]  We know of no state which,

Edward Logan, 64, 150, indicate by passing references to practices in many states the extent to which the door to door canvass is a staple of political life.

For encouragement of this practice, see Handbook of Club Organization, National Federation of Women's Republican Clubs (1942), 21; and Precinct Organization in War Time, a recent publication of the Democratic National Committee.

[10] Alabama Code (1940), Tit. 14, § 426; Connecticut Gen. Stat. (1930), § 6119; Florida Stat. (1941), § 821.01; Georgia Code Ann. (1938), § 26–3002; Illinois Ann. Stat. (Smith-Hurd, 1935), Ch. 38, § 565; Indiana Stat. (Burns, 1934), § 10–4506; Maryland Ann. Code (Flack, 1939), Art. 27, §§ 24, 286; Massachusetts Ann. Laws (1933), v. 9, Ch. 266, § 120; Mississippi Code Ann. (1930), § 1168; Nebraska Comp. Stat. (1929), §§ 76–807, 8; Nevada Comp. Laws (1929), § 10447; North Carolina Code (1943), § 14–134; Ohio Code Ann. (Throckmorton, 1940), § 12522; Oklahoma Stat. (1937), Tit. 21, § 1835; Oregon Comp. Laws Ann. (1940), §§ 23–593, 4; Pennsylvania Ann. Stat. (Purdon, 1942 Supp.), v. 18, § 4954; South Carolina Code (1942), § 1190; Virginia Code (1936), § 4480a; Washington Rev. Stat. (Remington, 1932), § 2665; Wyoming Rev. Stat. (1931), § 32–337.

[11] Arkansas Stat. (Pope, 1937), § 3181; California Penal Code (Deering, 1941), §§ 602, 627; Colorado Stat. Ann. (1935), v. 3, Ch. 73, § 118; Kentucky Rev. Stat. (Baldwin, 1942), §§ 433.720, 433.490;

as does the Struthers ordinance in effect, makes a person a criminal trespasser if he enters the property of another for an innocent purpose without an explicit command from the owners to stay away.[12] The National Institute of Municipal Law Officers has proposed a form of regulation to its member cities [13] which would make it an offense for any person to ring the bell of a householder who has appropriately indicated that he is unwilling to be disturbed. This or any similar regulation leaves the decision as to whether distributers of literature may lawfully call at a home where it belongs—with the home-owner himself. A city can punish those who call at a home in defiance of the previously expressed will of the occupant and, in addition, can by identification devices control the abuse of the privilege by criminals posing as canvassers.[14] In any case, the problem must be worked

Louisiana Gen. Stat. (Dart, 1939), § 9463; Maine Rev. Stat. (1930), Ch. 139, § 22; Minnesota Stat. (1941), § 621.57; Montana Rev. Code Ann. (1935), § 11482; New Hampshire Public Laws (1926), Ch. 380, § 11; New Jersey Rev. Stat. (1937), Tit. 4, § 17-2; New York Consol. Laws Ann. (McKinney, 1941), Conservation Law, §§ 361-364; Texas Stat. (Vernon, 1936), P. C. Art. 1377.

[12] Municipalities have occasionally made canvassers trespassers without requiring that the householder give an explicit notice, as the instant ordinance testifies. See e. g. *People* v. *Bohnke*, 287 N. Y. 154, 38 N. E. 2d 478.

[13] Municipalities and the Law in Action (1943), National Institute of Municipal Law Officers, 373. We do not, by this reference, mean to express any opinion on the wisdom or validity of the particular proposals of the Institute.

[14] "Nothing we have said is intended even remotely to imply that, under the cloak of religion, persons may, with impunity, commit frauds upon the public. Certainly penal laws are available to punish such conduct. Even the exercise of religion may be at some slight inconvenience in order that the State may protect its citizens from injury. Without doubt a State may protect its citizens from fraudulent solicitation by requiring a stranger in the community, before permitting him publicly to solicit funds for any purpose, to establish his identity and his authority to act for the cause which he purports to represent." *Cantwell* v. *Connecticut*, 310 U. S. 296, 306.

out by each community for itself with due respect for the constitutional rights of those desiring to distribute literature and those desiring to receive it, as well as those who choose to exclude such distributers from the home.

The Struthers ordinance does not safeguard these constitutional rights. For this reason, and wholly aside from any other possible defects, on which we do not pass but which are suggested in other opinions filed in this case, we conclude that the ordinance is invalid because in conflict with the freedom of speech and press.

The judgment below is reversed for further proceedings not inconsistent with this opinion.

*Reversed.*

MR. JUSTICE MURPHY, concurring:

I join in the opinion of the Court, but the importance of this and the other cases involving Jehovah's Witnesses decided today, moves me to add this brief statement.

I believe that nothing enjoys a higher estate in our society than the right given by the First and Fourteenth Amendments freely to practice and proclaim one's religious convictions. Cf. *Jones* v. *Opelika*, 316 U. S. 584 at 621. The right extends to the aggressive and disputatious as well as to the meek and acquiescent. The lesson of experience is that—with the passage of time and the interchange of ideas—organizations, once turbulent, perfervid and intolerant in their origin, mellow into tolerance and acceptance by the community, or else sink into oblivion. Religious differences are often sharp and pleaders at times resort "to exaggeration, to vilification of men who have been, or are, prominent in church or state, and even to false statement. But the people of this nation have ordained in the light of history, that, in spite of the probability of excesses and abuses, these liberties are, in the long view, essential to enlightened opinion and right conduct on the part of the citizens of a democracy." *Cantwell* v. *Connecticut*, 310 U. S. 296, 310. If a religious be-

lief has substance, it can survive criticism, heated and abusive though it may be, with the aid of truth and reason alone. By the same method, those who follow false prophets are exposed. Repression has no place in this country. It is our proud achievement to have demonstrated that unity and strength are best accomplished, not by enforced orthodoxy of views, but by diversity of opinion through the fullest possible measure of freedom of conscience and thought.

Also, few, if any, believe more strongly in the maxim, "a man's home is his castle," than I. Cf. *Goldman* v. *United States,* 316 U. S. 129 at 136. If this principle approaches a collision with religious freedom, there should be an accommodation, if at all possible, which gives appropriate recognition to both. That is, if regulation should be necessary to protect the safety and privacy of the home, an effort should be made at the same time to preserve the substance of religious freedom.

There can be no question but that appellant was engaged in a religious activity when she was going from house to house in the City of Struthers distributing circulars advertising a meeting of those of her belief. Distribution of such circulars on the streets cannot be prohibited. *Jamison* v. *Texas,* 318 U. S. 413. Nor can their distribution on the streets or from house to house be conditioned upon obtaining a license which is subject to the uncontrolled discretion of municipal officials, *Lovell* v. *Griffin,* 303 U. S. 444; *Schneider* v. *State,* 308 U. S. 147; *Largent* v. *Texas,* 318 U. S. 418, or upon payment of a license tax for the privilege of so doing. *Murdock* v. *Pennsylvania, ante,* p. 105; *Jones* v. *Opelika, ante,* p. 103. Preaching from house to house is an age-old method of proselyting, and it must be remembered that "one is not to have the exercise of his liberty of expression in appropriate places abridged on the plea that it may be exercised in some other place." *Schneider* v. *State, supra,* p. 163.

No doubt there may be relevant considerations which justify considerable regulation of door to door canvassing, even for religious purposes,—regulation as to time, number and identification of canvassers, etc., which will protect the privacy and safety of the home and yet preserve the substance of religious freedom. And, if a householder does not desire visits from religious canvassers, he can make his wishes known in a suitable fashion. The fact that some regulation may be permissible, however, does not mean that the First Amendment may be abrogated. We are not dealing here with a statute "narrowly drawn to cover the precise situation" that calls for remedial action, *Thornhill* v. *Alabama,* 310 U. S. 88, 105; *Cantwell* v. *Connecticut, supra,* at 311. As construed by the state courts and applied to the case at bar, the Struthers ordinance prohibits door to door canvassing of any kind, no matter what its character and purpose may be, if attended by the distribution of written or printed matter in the form of a circular or pamphlet. I do not believe that this outright prohibition is warranted. As I understand it, the distribution of circulars and pamphlets is a relatively minor aspect of the problem. The primary concern is with the act of canvassing as a source of inconvenience and annoyance to householders. But if the city can prohibit canvassing for the purpose of distributing religious pamphlets, it can also outlaw the door to door solicitations of religious charities, or the activities of the holy mendicant who begs alms from house to house to serve the material wants of his fellowmen and thus obtain spiritual comfort for his own soul.

Prohibition may be more convenient to the law maker, and easier to fashion than a regulatory measure which adequately protects the peace and privacy of the home without suppressing legitimate religious activities. But that does not justify a repressive enactment like the one now before us. Cf. *Schneider* v. *State, supra,* p. 164. Freedom of religion has a higher dignity under the Con-

stitution than municipal or personal convenience. In
these days, free men have no loftier responsibility than the
preservation of that freedom. A nation dedicated to that
ideal will not suffer but will prosper in its observance.

MR. JUSTICE DOUGLAS and MR. JUSTICE RUTLEDGE join
in this opinion.

MR. JUSTICE FRANKFURTER:

From generation to generation, fresh vindication is
given to the prophetic wisdom of the framers of the Con-
stitution in casting it in terms so broad that it has adapt-
able vitality for the drastic changes in our society which
they knew to be inevitable, even though they could not
foresee them. Thus it has come to be that the transform-
ing consequences resulting from the pervasive industriali-
zation of life find the Commerce Clause appropriate, for
instance, for national regulation of an aircraft flight wholly
within a single state. Such exertion of power by the na-
tional government over what might seem a purely local
transaction would, as a matter of abstract law, have been
as unimaginable to Marshall as to Jefferson, precisely be-
cause neither could have foreseen the present conquest of
the air by man. But law, whether derived from acts of
Congress or the Constitution, is not an abstraction. The
Constitution cannot be applied in disregard of the exter-
nal circumstances in which men live and move and have
their being. Therefore, neither the First nor the Four-
teenth Amendment is to be treated by judges as though it
were a mathematical abstraction, an absolute having no
relation to the lives of men.

The habits and security of life in sparsely settled rural
communities, or even in those few cities which a hundred
and fifty years ago had a population of a few thousand,
cannot be made the basis of judgment for determining the
area of allowable self-protection by present-day indus-
trial communities. The lack of privacy and the hazards

to peace of mind and body caused by people living not in individual houses but crowded together in large human beehives, as they so widely do, are facts of modern living which cannot be ignored.

Concededly, the Due Process Clause of the Fourteenth Amendment did not abrogate the power of the states to recognize that homes are sanctuaries from intrusions upon privacy and of opportunities for leading lives of health and safety. Door-knocking and bell-ringing by professed peddlers of things or ideas may therefore be confined within specified hours and otherwise circumscribed so as not to sanctify the rights of these peddlers in disregard of the rights of those within doors. Acknowledgement is also made that the City of Struthers, the particular ordinance of which presents the immediate issue before us, is one of those industrial communities the residents of which have a working day consisting of twenty-four hours, so that for some portions of the city's inhabitants opportunities for sleep and refreshment require during day as well as night whatever peace and quiet is obtainable in a modern industrial town. It is further recognized that the modern multiple residences give opportunities for pseudo-canvassers to ply evil trades—dangers to the community pursued by the few but far-reaching in their success and in the fears they arouse.

The Court's opinion apparently recognizes these factors as legitimate concerns for regulation by those whose business it is to legislate. But it finds, if I interpret correctly what is wanting in explicitness, that instead of aiming at the protection of householders from intrusion upon needed hours of rest or from those plying evil trades, whether pretending the sale of pots and pans or the distribution of leaflets, the ordinance before us merely penalizes the distribution of "literature." To be sure, the prohibition of this ordinance is within a small circle. But it is not our business to require legislatures to extend the area

of prohibition or regulation beyond the demands of revealed abuses. And the greatest leeway must be given to the legislative judgment of what those demands are. The right to legislate implies the right to classify. We should not, however unwittingly, slip into the judgment seat of legislatures. I myself cannot say that those in whose keeping is the peace of the City of Struthers and the right of privacy of its home dwellers could not single out, in circumstances of which they may have knowledge and I certainly have not, this class of canvassers as the particular source of mischief. The Court's opinion leaves one in doubt whether prohibition of all bell-ringing and door-knocking would be deemed an infringement of the constitutional protection of speech. It would be fantastic to suggest that a city has power, in the circumstances of modern urban life, to forbid house-to-house canvassing generally, but that the Constitution prohibits the inclusion in such prohibition of door-to-door vending of phylacteries or rosaries or of any printed matter. If the scope of the Court's opinion, apart from some of its general observations, is that this ordinance is an invidious discrimination against distributors of what is politely called literature, and therefore is deemed an unjustifiable prohibition of freedom of utterance, the decision leaves untouched what are in my view controlling constitutional principles, if I am correct in my understanding of what is held, and I would not be disposed to disagree with such a construction of the ordinance.

MR. JUSTICE REED, dissenting:

While I appreciate the necessity of watchfulness to avoid abridgments of our freedom of expression, it is impossible for me to discover in this trivial town police regulation a violation of the First Amendment. No ideas are being suppressed. No censorship is involved. The freedom to teach or preach by word or book is unabridged, save only the right to call a householder to the door of

his house to receive the summoner's message. I cannot expand this regulation to a violation of the First Amendment.

Freedom to distribute publications is obviously a part of the general freedom guaranteed the expression of ideas by the First Amendment. It is trite to say that this freedom of expression is not unlimited. Obscenity, disloyalty and provocatives do not come within its protection. *Near* v. *Minnesota,* 283 U. S. 697, 712, 716; *Schenck* v. *United States,* 249 U. S. 47, 51; *Chaplinsky* v. *New Hampshire,* 315 U. S. 568, 572, 574. All agree that there may be reasonable regulation of the freedom of expression. *Cantwell* v. *Connecticut,* 310 U. S. 296, 304. One cannot throw dodgers "broadcast in the streets." *Schneider* v. *State,* 308 U. S. 147, 161.

The ordinance forbids "any person distributing handbills, circulars or other advertisements to ring the door bell, sound the door knocker, or otherwise summon the inmate or inmates . . . to the door" to receive the advertisement. The Court's opinion speaks of prohibitions against the distribution of "literature." The precise matter distributed appears in the footnote.[1]  I do not

[1] "RELIGION as a WORLD REMEDY, The Evidence in Support Thereof. Hear JUDGE RUTHERFORD, Sunday, July 28, 4 P. M., E. S. T. FREE. All Persons of Goodwill Welcome, FREE. Columbus Coliseum, Ohio State Fair Grounds." [On one side.]

"1940's Event of Paramount Importance To You! What is it? The THEOCRATIC CONVENTION OF JEHOVAH'S WITNESSES. Five Days— July 24–28—Thirty Cities. All Lovers of Righteousness—Welcome! The strange fate threatening all 'Christendom' makes it imperative that you COME and HEAR the public address on RELIGION As A WORLD REMEDY, The Evidence in Support Thereof, by Judge Rutherford at the COLISEUM of the OHIO STATE FAIR GROUNDS, Columbus, Ohio, Sunday, July 28, at 4 p. m., E. S. T. 'He that hath an ear to hear' will come to one of the auditoriums of the convention cities listed below, tied in with Columbus by direct wire. Some of the 30 cities are [21 are listed]. For detailed information concerning these conventions write WATCHTOWER CONVENTION COMMITTEE, 117 Adams St., Brooklyn, N. Y." [On the other side.]

read the ordinance as prohibiting the distribution of literature nor can I appraise the dodger distributed as falling into that classification. If the ordinance, in my view, did prohibit the distribution of literature, while permitting all other canvassing, I should believe such an ordinance discriminatory. This ordinance is different. The most, it seems to me, that can be or has been read into the ordinance is a prohibition of free distribution of printed matter by summoning inmates to their doors. There are excellent reasons to support a determination of the city council that such distributors may not disturb householders while permitting salesmen and others to call them to the door. Practical experience may well convince the council that irritations arise frequently from this method of advertising. The classification is certainly not discriminatory.[2]

If the citizens of Struthers desire to be protected from the annoyance of being called to their doors to receive printed matter, there is to my mind no constitutional provision which forbids their municipal council from modifying the rule that anyone may sound a call for the householder to attend his door. It is the council which is entrusted by the citizens with the power to declare and abate the myriad nuisances which develop in a community. Its determination should not be set aside by this Court unless clearly and patently unconstitutional.

The antiquity and prevalence of colportage are relied on to support the Court's decision. But the practice has persisted because the householder was acquiescent. It can hardly be thought, however, that long indulgence of a practice which many or all citizens have welcomed or tolerated creates a constitutional right to its continuance.

---

[2] *Keokee Coke Co.* v. *Taylor,* 234 U. S. 224; *German Alliance Insurance Co.* v. *Kansas,* 233 U. S. 389; *Hall* v. *Geiger-Jones Co.,* 242 U. S. 539; *Minnesota* v. *Probate Court,* 309 U. S. 270; *Labor Board* v. *Jones & Laughlin Corp.,* 301 U. S. 1, 46; *Carmichael* v. *Southern Coal Co.,* 301 U. S. 495, 509, 512.

Changing conditions have begotten modification by law of many practices once deemed a part of the individual's liberty.

The First Amendment does not compel a pedestrian to pause on the street to listen to the argument supporting another's views of religion or politics. Once the door is opened, the visitor may not insert a foot and insist on a hearing. He certainly may not enter the home. To knock or ring, however, comes close to such invasions. To prohibit such a call leaves open distribution of the notice on the street or at the home without signal to announce its deposit. Such assurance of privacy falls far short of an abridgment of freedom of the press. The ordinance seems a fair adjustment of the privilege of distributors and the rights of householders.

Mr. Justice Roberts and Mr. Justice Jackson join in this dissent.

See also opinion of Mr. Justice Jackson, *post*, p. 166.