CITY OF BOWLING GREEN, APPELLEE, *v.* LODICO, APPELLANT.

(No. 40541—Decided July 12, 1967.)

Mr. *C. Richard Marsh*, city solicitor, and Mr. *Daniel T. Spitler*, for appellee.

Mr. *Niki Z. Schwartz*, Mr. *Harland M. Britz* and Mr. *Gerald B. Lackey*, for appellant.

SCHNEIDER, J. Defendant was arrested on a public sidewalk[1] outside of Alice Prout Hall on the campus of Bowling Green

---

[1] The record indicates that the sidewalk was located on Ridge Street. The court assumes that it was a public way. No contention was made by either party to the contrary.

It is further assumed that Ridge Street is not a street of Bowling Green State University. This assumption covers two issues, neither of which were raised by the parties.

State University for soliciting sales of a magazine entitled *Young Socialist* without a license as required by an ordinance of the city of Bowling Green.

The ordinance reads: "It shall be unlawful for any peddler, solicitor or canvasser, or for any itinerant merchant to solicit sales of, to sell, to offer for sale, to barter, or to exchange goods, wares, or personal services without first obtaining from the Safety-Service Director a license to do so."

The ordinance provides further that an applicant for a license is required to furnish a photograph of himself, his fingerprints in duplicate, his home address, name and address of his employer, length of service with such employer, all places of residence and all employment during the preceding year, the nature and character of the goods to be sold or services to be furnished, the names of other towns in which the applicant has recently conducted a business for which a license would be required by ordinance, and a personal description of the applicant.

The application must be made at least ten days before the license is required. If the Safety-Service Director, after a reasonable investigation, determines that the applicant is of "good moral character and proposes to engage in a lawful commercial or professional enterprise," a license will be issued. An identification badge must be worn by peddlers or solicitors while engaging in their business. Excluded from the licensing requirements are, *inter alia*, the sale of newspapers and "a duly authorized solicitor soliciting the purchase of goods or wares for or on behalf of any recognized educational, civic, religious, or charitable organization."

Defendant was on tour throughout the Midwest to publicize a conference being held at Wayne State University under the auspices of the Young Socialist Alliance, for the purpose of promoting the candidate of the Socialist Workers Party for President of the United States.

The magazine in question sold for twenty-five cents, the proceeds going to defray the personal living expenses of the defendant. Defendant testified that if there were any surplus left after the payment of his expenses, it would be turned into the general fund of the Young Socialist Alliance, which published the magazine at a deficit, but that it was most unlikely that

there would be any surplus and to the best of his knowledge there never had been.

The Mayor's Court of Bowling Green found defendant guilty, and that conviction was affirmed by the Court of Common Pleas. After the Court of Appeals dismissed the appeal for want of a valid bill of exceptions, due to the failure of the trial judge to sign it, this court reversed. *City of Bowling Green* v. *Lodico*, 6 Ohio St. 2d 167. On remand, the Court of Appeals affirmed the judgment of conviction.

In *Schneider* v. *Irvington*, 308 U. S. 147, 84 L. Ed. 155, the court denounced a licensing scheme virtually identical to the present one, but limited to house-to-house solicitation. The discretion of the chief of police there to refuse a permit where in his judgment the canvasser was not of "good character" was said to strike at the core of constitutional guarantees.

Initially, the right to publish is unconditional. To the extent that the police are to be permitted to limit publication depending on the motive of the publisher or his good character, the right to publish is diminished. And, to the extent that the police may impede the circulation of a publication, the right is delimited.

Censorship, when done in the guise of determining moral character, is no less censorship and may not be employed as a basis for inhibiting freedom of expression. *Konigsberg* v. *State Bar of California*, 353 U. S. 252, 1 L. Ed. 2d 810.

Evil motives on the part of the publisher or the disreputable character of the circulators of a publication might well give rise to a public scandal, "but the theory of the constitutional guaranty is that even a more serious public evil would be caused by authority to prevent publication * * * and if [the former] consideration warranted legislative interference with the initial freedom of publication, the constitutional protection would be reduced to a mere form of words," *Near* v. *Minnesota, ex rel. Olson*, 283 U. S. 697, 722, 75 L. Ed. 1357.

The unfettered discretion vested in the licensing official by the ordinance is clearly illustrated by reference to the explanation by the Mayor of the exception created for any *recognized* educational, civic, religious, or charitable organization: "It is not the opinion of this court that all such organizations in

these areas that publish, print, and disseminate material, are or should be so *recognized*." (Emphasis supplied.)

The ordinance thus constitutes a prior restraint on speech and publication. Unless the "sale" of the magazine for twenty-five cents to defray the personal living expenses of the defendant transforms the distribution into a "commercial" venture not subject to the constitutional guarantees of free speech and press, the conviction cannot stand.

The problems created by the distinction of commercial and noncommercial solicitation have not gone unnoticed by the Supreme Court of the United States. In *Murdock* v. *Pennsylvania*, 319 U. S. 105, 110, 87 L. Ed. 1292, the court said: "Situations will arise where it will be difficult to determine whether a particular activity is religious or purely commercial. The distinction at times is vital. * * * The constitutional rights of those spreading their religious beliefs through the spoken and printed word are not to be gauged by standards governing retailers or wholesalers of books. The right to use the press for expressing one's views is not to be measured by the protection afforded commercial handbills. It should be remembered that the pamphlets of Thomas Paine were not distributed free of charge. It is plain that a religious organization needs funds to remain a going concern. But an itinerant evangelist however misguided or intolerant he may be, does not become a mere book agent by selling the Bible or religious tracts to help defray expenses or to sustain him. Freedom of speech, freedom of the press, freedom of religion are available to all, not merely to those who can pay their own way."

This statement reiterates the view expressed in *Jones* v. *Opelika*, 316 U. S. 584, 619, 86 L. Ed. 1691: "Freedom of speech and freedom of the press cannot and must not mean freedom only for those who can distribute their broadsides without charge. There may be others with messages more vital but purses less full, who must seek some reimbursement for their outlay or else forego passing on their ideas."

On the other hand, the Supreme Court has upheld a municipal ordinance proscribing house-to-house solicitation unless upon request or invitation. *Breard* v. *Alexandria*, 341 U. S. 622, 95 L. Ed. 1233. In holding the "Green River" ordinance in-

volved in that case not to be violative of the First Amendment, the court distinguished *Martin* v. *Struthers* (319 U. S. 141, 87 L. Ed. 1313), wherein it struck down an ordinance making it unlawful for anyone distributing literature to summon the inhabitants to the door for the purpose of receiving such literature. Thus, a municipality may prohibit house-to-house canvassing in search of sales of encyclopedias (*West Jefferson* v. *Robinson*, 1 Ohio St. 2d 113), but may not proscribe even house-to-house canvassing when its purpose is the *free* distribution of an invitation to religious services.

In *Breard*, the activities of the defendant were wholly commercial. He was soliciting subscriptions to a wide variety of popular magazines for a corporation which did an annual business of more than $5,000,000. In the case at bar, the defendant was soliciting sales of *the October issue* of a magazine which was purely political.' The ordinance in *Breard* did not depend on the discretion of a licensing official. Rather, it prohibited house-to-house canvassing except upon request. Its constitutionality turned upon "a balancing of the conveniences between some householders' desire for privacy and the publisher's right to distribute publications in the precise way that those soliciting for him think brings the best results." *Breard* v. *Alexandria, supra* (341 U. S. 622), at page 644. On the other hand, a flat prohibition against street solicitation is unconstitutional. *Lovell* v. *Griffin*, 303 U. S. 444, 82 L. Ed. 949. On-the-street solicitation does not involve the same balancing of interests as does door-to-door canvassing. Peripatetic solicitors on the public way do not offend the right to privacy. The right to be wholly free from even the slightest interruption on a public street does not weigh as heavily in the balance against Ohio's Article I and

---

[2]The lead article promoted the candidacies of Clifton DeBerry and Edward Shaw, the Socialist Workers Party's presidential ticket. The other articles were entitled, "Canada's 'Negro Struggle,'" "Johnson's Dirty War in Vietnam," "The W. E. B. DuBois Clubs of America," "Introducing the Young Socialist Alliance," "Reflections on the Harlem Events," "Appeal in Bloomington Students' Case," "What we saw in Cuba," and "Book Reviews." The back cover urged the election of DeBerry and Shaw in bold-face black type. The only advertisement was for books and pamphlets of the socialist persuasion on the inside back cover, which does not render the magazine commercial. *Jamison* v. *Texas*, 318 U. S. 413, 87 L. Ed. 869.

federal First Amendment freedoms as does the right to privacy in the home. On a public way, the citizen must accept the inconvenience of political proselytizing as essential to the preservation of a republican form of government.

The solicitation for, and receipt of, twenty-five cents for a *single copy* of a *wholly political magazine* may not subject its solicitor on a public sidewalk to the penalties of an ordinance proscribing such conduct without a license first obtained and granting unfettered discretion to the licensing official to determine, before issuing the license, the solicitor's moral character and whether the enterprise involved is "lawful." The application of the ordinance to defendant is violative of Section 11, Article I of the Constitution of the state of Ohio, and the First and Fourteenth Amendments to the Constitution of the United States.

In *Peltz* v. *South Euclid*, 11 Ohio St. 2d 128, as here, there was a *bona fide* attempt to participate in the elective process by political comment on the candidates and issues involved. In neither case were those involved participating in a fraud, creating a public disturbance, distributing obscene literature, or creating a danger to society.

"The constitutional safeguard [of free speech] * * * was fashioned to assure unfettered interchange of ideas for the bringing about of political and social changes desired by the people. * * * The maintenance of the opportunity for free political discussion to the end that government may be responsive to the will of the people and that changes may be obtained by lawful means, an opportunity essential to the security of the Republic, is a fundamental principle of our constitutional system." *New York Times Co.* v. *Sullivan*, 376 U. S. 254, 269, 11 L. Ed. 2d 686.

The conviction of defendant is reversed.

*Judgment reversed.*

TAFT, C. J., ZIMMERMAN, MATTHIAS, O'NEILL, HERBERT and BROWN, JJ., concur.