The COUNCIL OF GREENBURGH CIVIC ASSOCIATIONS and the Saw Mill Valley Civic Association, Plaintiffs,

v.

The UNITED STATES POSTAL SERVICE, Defendant.

No. 77 Civ. 483 (WCC).

United States District Court, S. D. New York.

April 24, 1980.

**158**

Jon H. Hammer, New York City, for plaintiffs; E. Payson Clark, Jr., New York City, of counsel.

William M. Tendy, U. S. Atty. for the Southern District of New York, New York City, for defendant, U. S. Postal Service; Mary C. Daly, Asst. U. S. Atty., New York City, of counsel.

## OPINION AND ORDER

CONNER, District Judge:

This action is brought by an umbrella organization for numerous Westchester County civic associations, The Council of Greenburgh Civic Associations, and one of the Council's member associations, the Saw Mill Valley Civic Association. Plaintiffs seek, on First Amendment grounds, declaratory and injunctive relief from the Postal Service's threatened enforcement of 18

U.S.C. § 1725 [1] with regard to the activities of plaintiffs and other Council members in depositing unstamped flyers and notices in mailboxes of private homes located in the Town of Greenburgh. Plaintiffs further seek similar relief on behalf of "others similarly situated."

The case is before this Court on remand from a decision of the Second Circuit Court of Appeals directing this Court to give the parties an opportunity to submit proof as to (1) the nature and extent of the handicap to plaintiffs' ability to communicate with their constituents if the statute is enforced (thus restricting plaintiffs to use of the mails or to alternative means of house-to-house distribution) and (2) the opposing interest of the Postal Service in enforcing the statute as to these plaintiffs, particularly the Postal Service's interest in preventing mailbox overcrowding, promoting the security of the mails, and protecting mail revenues. *Council of Greenburgh Civic Associations v. United States Postal Service*, 586 F.2d 935 (2d Cir. 1978). This Court heard testimony on these issues on June 28 and July 5 and 6, 1979.

This opinion and order incorporates the Court's findings of fact and conclusions of law pursuant to Rule 52(a), F.R.Civ.P.

*Legal Standard*

■ Both the majority opinion for the Second Circuit and Judge Kaufman in his concurring opinion suggested that the named plaintiffs [2] would be entitled to relief if the testimony at trial indicated that, on balance, the curtailment of plaintiffs' interest in free expression resulting from enforcement of the statute substantially outweighed the government's interest in the effective delivery and the protection of the mails. 586 F.2d at 936–37. Judge Kaufman further suggested, see 586 F.2d at 937, that plaintiffs might be entitled to relief on a showing of a less substantial curtailment of their interest in free expression if the testimony at trial indicated that the deposit of circulars in mailboxes constituted such an established means of communication that the mailboxes could be considered a public forum within the meaning of cases such as *Grayned v. City of Rockford*, 408 U.S. 104, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972); *Martin v. City of Struthers*, 319 U.S. 141, 63 S.Ct. 862, 87 L.Ed. 1313 (1943); and *Cox v. New Hampshire*, 312 U.S. 569, 61 S.Ct. 762, 85 L.Ed. 1049 (1941), and if the evidence further showed that the statute as applied did not constitute a reasonable restriction of time, place and manner upon the use of that forum, see *Grayned, supra*, 408 U.S. at 116–17, 2303–2304.

*Testimony at Trial*

A. Burden on Plaintiffs' Ability to Communicate

1. Burden flowing from use of the mails

The evidence at trial establishes that use of the mails is financially burdensome to plaintiffs and constitutes a significant impediment to plaintiffs' ability to communicate quickly with their constituents. Numerous witnesses testified to the small or nonexistent cash reserves of the neighborhood civic groups represented by the umbrella organization of the Council of Greenburgh Civic Associations, as well as to the small cash reserves of the Council itself. Trial transcript ("Tr.") at 23, 94–95, 150–51, 208–09, 253. Plaintiffs' witnesses also testi-

---

1. That section reads as follows:

 "§ 1725. Postage unpaid on deposited mail matter

 Whoever knowingly and willfully deposits any mailable matter such as statement of accounts, circulars, sale bills, or other like matter, on which no postage has been paid, in any letter box established, approved, or accepted by the Postmaster General for the receipt or delivery of mail matter on any mail route with intent to avoid payment of lawful postage thereon, shall for each such offense be fined not more than $300."

2. The Circuit Court did not consider plaintiffs' contention that the Postal Service should also be enjoined from prosecuting under the statute other, similar, noncommercial local civic associations since this is not a class action, and, in pre-trial conferences, plaintiffs indicated that they sought relief only for themselves and their members. See this Court's opinion below, 448 F.Supp. 159 (S.D.N.Y.1978) (Conner, J.), granting defendant's motion to dismiss under Rule 12(b), F.R.Civ.P.

fied that the majority of Greenburgh neighborhood associations, because of their size or tax status, were not eligible for bulk mail or charitable organization mail rates; that the majority of such groups could not afford even those reduced rates on a regular basis; and that the updating of the address lists necessary for a mailing and the addressing of envelopes or folded flyers constituted a significant administrative burden on a small volunteer civic group. See, e. g., Tr. at 22–23, 82, 108. Defendants did not contradict this testimony, except to indicate that certain larger civic associations might qualify for bulk mail rates if they could pay the initial fee.

Plaintiffs' witnesses further testified that much of the business of local civic associations concerns activities of local government bodies—town and village boards, school boards, and the like; and that the agendas for such meetings are often available only a short time before the meetings, or that matters come up without being placed on a prepared agenda, so that notice must often be given to constituents within a very short time. Tr. at 22, 152, 214–15, 340. The mail, these witnesses stated, has not, in their experience as civic organization members, been delivered with the speed required to notify constituents of such urgent matters. Tr. at 23, 168–70, 197–99, 624. Defendant's witnesses did not refute plaintiffs' evidence as to the speed of mail service in the Town of Greenburgh: while defendant did introduce evidence showing that internal Post Office guidelines require delivery of bulk mail within two days after it arrives at the receiving post office, Tr. at 366 and defendant's Exhibit G, defendant's witnesses admitted that these time standards are frequently not met, Tr. at 422–23, that their compliance figures for White Plains bulk mail rely on a sample of less than 5% of such mail, Tr. at 465–66, and that the standards are especially difficult to achieve in a multi-Post Office region such as the Town of Greenburgh, Tr. at 467.

### 2. Effectiveness of Alternative Methods of Delivery

The evidence further establishes that none of the alternative means of flyer delivery or other communication suggested by defendant or by the Second Circuit—hanging material on door knobs, placing flyers under doors, using newspaper or other non-postal boxes affixed to houses or mailbox posts, telephone communication, hand-to-hand delivery, leaving flyers wrapped in a plastic sandwich bag on the doorstep—is nearly as effective as placing civic association flyers in approved mailboxes; so that restriction of plaintiffs' delivery methods to such alternatives also constitutes a serious burden on plaintiffs' ability to communicate with their constituents.

Plaintiffs' witnesses testified at length as to the impracticality of the alternative delivery methods suggested. If civic associations attempt to deliver notices by leaving them outside, unprotected (i. e., by inserting them part way into a door, or under a doormat, or taped onto a door), they testified that the materials are often lost, blown away or damaged or hidden by rain or snow before the occupant has an opportunity to retrieve and read them. Tr. at 41, 106, 150–52, 238, 258–59. They further testified that it is usually impossible for a civic association member to deliver flyers by slipping them all the way under the door of a house in these suburban areas because the vast majority of homes have weatherstripping under the outside door or screen door. Tr. at 85. If special measures are employed to protect the flyers from the weather—i. e., use of special plastic bags which fit over a doorknob, or placing the flyers in conventional plastic bags—these measures take time and are relatively expensive for a small volunteer organization, Tr. at 35, 622; moreover, the plastic-wrapped notices may also be blown away or lost, and the special door-knob bags may not be suitable for all the different types of door handles found on houses in the area. Tr. at 35, 87, 150–52. Defendant's own survey, which measured two alternative delivery methods against in-mailbox delivery, demonstrated that non-mailbox delivery methods are markedly less successful in reaching occupants than is mailbox delivery. Tr. at 535; Defendant's Exhibit D 1.

In addition, plaintiffs' witnesses testified that nonmailbox flyer delivery often caused resentment among their constituents because leaving such material outside in plain sight could be an advertisement to burglars that the house was empty, Tr. at 38, 84–85, 150–52, 258, and because of the litter problem created by flyers blown about the neighborhood, Tr. at 35.

Plaintiffs' witnesses also testified that alternative communication methods which depended on reaching the occupant personally—personal delivery of notices, or phone calls to the occupant's home—had proved to be far less effective than mailbox delivery in reaching constituents, since at any given time the person called or visited might not be home, and since volunteer callers or visitors could not or would not take the time to make several visits or calls to each constituent, while a notice in a constituent's mailbox would reach him at whatever time he came home. Tr. at 42 (hand delivery); 111, 343.

Finally, plaintiffs introduced testimony that only a limited number of residents have newspaper or other nonmailbox receptacles attached to their mailbox posts or to their houses, impeding the effective use of such boxes for distributing civic association materials. Tr. at 620.

### 3. Effect of Enforcement of § 1725 on Civic Associations

The burdensome nature of the restriction on mailbox delivery on the activities of these civic associations is further established by testimony that, subsequent to the time certain Greenburgh area civic associations received enforcement letters from the Postal Service and began to comply with the requirements of the statute, the effectiveness of those organizations as measured by, among other things, attendance at association meetings and ability to produce attendance at local government functions, has been reduced. Plaintiffs' witnesses further testified that, as a result of their restricted ability to communicate with prospective and current members, the membership of certain Greenburgh civic associations has dropped to the point at which the associations are no longer viable entities. Tr. at 192–93; 344.

### B. Need for Enforcement of the Statute: the Postal Service's Position

### 1. Mailbox overcrowding

The evidence does not demonstrate that the crowding of mailboxes due to deposit of civic association notices constitutes an impediment to delivery of the mails. Several civic organization representatives testified on behalf of plaintiffs that they had had considerable experience with mailbox delivery and that they had never observed serious mailbox clutter or overflow when they deposited their organization's flyers. Tr. at 31, 116, 150, 341. The defendant did not introduce evidence on this point and does not appear to be pressing a claim of overcrowding.

### 2. Security of the mails

Four postal inspectors testified that enforcement of 18 U.S.C. § 1725 was marginally useful in the enforcement of the statutes relating to "internal" mail theft (i. e., theft by Post Office employees) and "external" mail theft (by others), the Private Express Statutes, and the mail fraud and related anti-fraud statutes. Inspector Edmund H. Mullins testified that if the government could not enforce § 1725, it would interfere with investigations of internal mail theft, since postal patrons might become accustomed to seeing unauthorized persons approaching and opening mailboxes and would not report such incidents as unusual. Inspector Mullins further testified, however, that internal mail theft investigations presently relied on the suspicion generated by persons standing at a mailbox only where the mailbox was placed by itself at some distance from the postal patron's house, Tr. at 139–40, and that enforcement of § 1725 does not eliminate internal mail thefts, Tr. at 143–44.

Inspector Alvin F. Lambden testified that § 1725 aided the enforcement of the Private Express Statutes contained in Title 39,

U.S.C. and 18 U.S.C. §§ 1694–96 and of the anti-fraud statutes of 18 U.S.C. §§ 1341–42 and 39 U.S.C. §§ 3005–07: when unstamped matter deposited in mailboxes was brought back to the local Post Office by the mail carrier, this could lead to prosecution under one of the two sets of statutes. Tr. at 270–71. Inspector Lambden then testified, however, that although he has investigated hundreds of cases under the mail fraud statutes, he has not investigated any fraud cases stemming from or related to a § 1725 investigation, Tr. at 305; and that he has only investigated ten § 1725 cases, all related to commercial users, Tr. at 306–07. Inspector Curtis L. Woodard also testified that § 1725 was an aid to enforcement of the mail fraud statutes, Tr. at 557–69, but admitted that the $300 fine contained in § 1725 for unstamped deposit of material in mailboxes would not constitute a substantial deterrent to a scheme to defraud formulated to avoid the jurisdictional reach of the mail fraud statutes by relying solely on unstamped deposit in mailboxes, Tr. at 561–62.

Inspector Allan P. Bzik testified that the enforcement of § 1725 was important to the success of surveillance operations used in investigations of external mail theft under 18 U.S.C. § 1708, Tr. at 590–91, since § 1725 limited the number of people who could approach a mailbox without arousing suspicion. He further testified, however, that only ten per cent of the arrests under the external theft statute resulted from such surveillance operations, Tr. at 595, and that failure to enforce § 1725 would not be "totally disastrous" to enforcement of the external theft statute, Tr. at 599.

### 3. Protection of mail revenues

Defendants presented testimony by John M. Nolan, General Manager of the Delivery Division of the Post Office's Northeast Region, on the additional cost to the Postal Service of limiting enforcement of § 1725 to commercial users. Mr. Nolan testified that the government would incur additional expense as a result of the additional time a mail carrier would have to spend in reviewing non-mail matter in the mailbox if certain types of non-mail matter (i. e., civic association material) could be left in the mailbox while other types (i. e., commercial matter) could not. Mr. Nolan estimated that the additional cost to the government of such a review would be approximately $160,000 on a daily basis nationwide. Tr. at 386–91, 395–96. Mr. Nolan also testified, however, that mail carriers do currently perform certain services requiring examination of material in the mailbox, including processing stamp purchases on behalf of rural postal patrons and review of material in a box for possible violations of the private express statutes. Tr. at 382–83.

Mr. Nolan further testified that § 1725 was currently enforced in a manner which was designed to recoup revenues directly by requiring those persons out of compliance with the statute to pay for the unstamped material found in mailboxes. Tr. at 407, 412. On the related point of future revenues, however, plaintiffs introduced the testimony of civic association members that the response of the majority of civic associations to threatened enforcement of § 1725 was to discontinue delivery of flyers altogether, rather than to switch to mail distribution.

### Discussion

The Court concludes that plaintiffs have shown that the burden on their ability to communicate ideas, positions on local issues, and civic information to their constituents flowing from enforcement of § 1725 is substantial. The Court further concludes that the cost to free expression of imposing this burden on plaintiffs outweighs the showing made by the Postal Service of its need to enforce the statute to promote effective delivery and protection of the mails.

As the Second Circuit has emphasized, the activities of plaintiffs here—informing community residents about the activities of their local government officials, identifying concerns of local residents to be brought to the attention of those officials, and encouraging residents to participate directly in local government decision-making by attending school board, town, water dis-

trict and other meetings—fall squarely within the range of activities which the First Amendment was expressly designed to protect. See, e. g., *Landmark Communications, Inc. v. Virginia*, 435 U.S. 829, 838, 98 S.Ct. 1535, 1541, 56 L.Ed.2d 1 (1978), citing *Mills v. Alabama*, 384 U.S. 214, 218, 86 S.Ct. 1434, 1437, 16 L.Ed.2d 484 (1966): " 'Whatever differences may exist about interpretations of the First Amendment, there is practically universal agreement that a major purpose of that Amendment was to protect the free discussion of governmental affairs' "; *Council of Greenburgh Civic Associations v. United States Postal Service, supra*, 586 F.2d at 938 (Kaufman, J., concurring) (discussion of "the fundamental right of house-to-house distribution"). Plaintiffs have shown that these activities have been curtailed to a significant degree by observance of the statutory prohibition, that, in the areas in which they operate, non-mailbox methods of delivery are much less satisfactory than mailbox delivery, and that use of the mails to deliver their messages is both financially prohibitive for most civic associations and slow to a degree which significantly diminishes their effectiveness in alerting their constituents to local government meetings and other impending local government activity.

The defendant, on the other hand, has not shown that failure to enforce the statute as to these groups would result in a substantial loss of revenue, or a significant reduction in the government's ability to protect the mails by investigating and prosecuting mail theft, mail fraud, or unauthorized private mail delivery service. The testimony does indicate that the Postal Service receives certain income from enforcement of § 1725, but the defendant has not demonstrated that the percentage of income which comes from enforcement of the statute against civic groups is large when compared with the revenue generated by enforcement against commercial entities, or when viewed in the context of the entire Postal Service budget. In addition, it appears that any projected future postal revenues resulting from enforcement of the statute against civic groups must be discounted by the likelihood that certain civic associations will greatly curtail their activities or even go out of existence altogether, as a result of enforcement of the statute. Moreover, the Court is not convinced that the Postal Service will be forced to expend substantial additional monies for additional time spent by mail carriers in enforcing § 1725 in the manner plaintiffs suggest. The conclusion drawn from defendant's time-motion study is dubious because defendant's witnesses further testified that mail carriers currently inspect material found in mailboxes for compliance with both § 1725 and the Private Express Statutes, and the defendant has not specified the incremental cost of a determination by the mail carrier during such an inspection that nonstamped material found in a mailbox is civic rather than commercial in nature. Since both commercial and non-commercial materials are usually delivered to every house within a selected area, the postal carrier will ordinarily have to examine a particular piece carefully only once, and will be able to recognize the same piece instantly when he sees it in other mailboxes on his route. Finally, enforcement of § 1725 against civic associations does not appear so necessary or contributive to enforcement of the anti-theft, anti-fraud or Private Express statutes that this interest outweighs the plaintiffs' substantial interest in expedient and economical communication with their constituents.[3]

---

**3.** Defendant further argues in its submissions that the construction of the statute which plaintiffs' advocate will infringe upon the privacy of homeowners, and that the Court should therefore also weigh this infringement in determining whether the balance tips in favor of plaintiffs. It appears to the Court, however, that while the Postal Service is charged with protecting the privacy of the mail with respect to the activities of their carriers, Tr. at 378, it does not follow that the Postal Service may raise here the privacy interest of homeowners with respect to third parties approaching the homeowners' houses or mailbox posts; and, further, that insofar as those homeowner interests are at issue here, homeowners may continue to exclude unwanted visitors through posting of "no trespassing" signs, enforcement of

**164**

The Postal Service will accordingly be enjoined from enforcing 18 U.S.C. § 1725 as to plaintiffs, and the Court will enter judgment declaring the statute unconstitutional as applied [4] to plaintiffs.[5]

 With respect to the application of the statute to "other groups similarly situated," the Court holds that plaintiff Council has standing to raise these claims on behalf of its member organizations, see *NAACP v. Button*, 371 U.S. 415, 428, 83 S.Ct. 328, 335, 9 L.Ed.2d 405 (1963), and finds that plaintiffs have shown that Council's member groups are similarly substantially burdened by enforcement of this statute. The Postal Service will accordingly be enjoined from enforcing 18 U.S.C. § 1725 against plaintiff Council's constituent civic associations as well as against the named plaintiffs, and the Court will enter judgment declaring enforcement of the statute as to such groups to be in violation of the First Amendment.

Plaintiffs shall submit a judgment on fifteen days' notice within ten days of the date of this Opinion and Order.

SO ORDERED.

local trespass laws and similar expedients, so that this factor does not tip the balance in favor of enforcement of § 1725 as to these civic associations.

4. The Court does not find, however, that plaintiffs have established that § 1725 is so significantly aimed at neighborhood civic groups or so unsusceptible to a narrowing construction as to be substantially overbroad within the meaning of *Broadrick v. Oklahoma*, 413 U.S. 601, 615, 93 S.Ct. 2908, 2917–2918, 37 L.Ed.2d 830 (1973); see also discussion in Council of Greenburgh v. U. S. Postal Service, supra, 583

F.2d at 938 (Kaufman, J., concurring) as to valid sweep of this statute.

5. In light of its conclusion that the evidence at trial shows that, even under a more stringent balancing test, plaintiffs are entitled to relief, the Court need not reach the issue of whether, under the alternative theory suggested by Judge Kaufman, plaintiffs have established that mailbox usage is so established as a means of civic group communication as to constitute a public forum whose use may be restricted only as to time, place and manner, see *Grayned, supra*.