Arnold E. STRASSER, Roger Friedman, Daniel W. Bickel, Marion Fish, Joseph Arsenault and Marjory Lou Foley, by her mother and next friend, Eleanor Rose Foley, individually and on behalf of all others similarly situated, and Extra, an unincorporated Association, Plaintiffs,

v.

Joseph A. DOORLEY, Jr., Mayor, City of Providence, Rhode Island; Harry Goldstein, Public Safety Commissioner, City of Providence; Col. Howard A. Franklin, Chief of Police, City of Providence; Capt. Edward P. Aptt, Providence Police; Joseph C. Scuncio, Chairman, Bureau of Licenses, City of Providence; Frank Lazarus and John J. Sheehan, Jr., Members of the Bureau of Licenses, City of Providence; and Robert J. McOsker, City Solicitor, City of Providence, Defendants.

Civ. A. No. 4241.

United States District Court
D. Rhode Island.

Jan. 13, 1970.

Supplemental Opinion Feb. 25, 1970.

Barry A. Fisher, R. I. Legal Services, Charles G. Edwards, Edwards & Angell, Providence, R. I., for plaintiffs.

David J. Kehoe, Law Dept., City of Providence, Ronald H. Glantz, Asst. City Solicitor, Providence, R. I., for defendants.

Hayden C. Covington, Barrington, R. I., amicus curiae.

## OPINION

PETTINE, District Judge.

This is a civil action brought pursuant to 42 U.S.C. § 1983 et seq. by plaintiffs on their own behalf and on behalf of all others similarly situated, to declare unconstitutional on its face and as applied, an ordinance [1] adopted

1. "LICENSES

Secs. 14-33—14-42. Reserved.

Article III. Bootblacks and Newsboys *
* Charter reference—Bureau of licenses, § 5.35 et seq.
State law references—Scope of ordinances which may be enacted, § 45-6-1, Gen.Laws 1956; special act authorizing city council to establish system of fees for granting or issuing licenses or permits, P.L.1922, ch. 2241.

Sec. 14-43. Permit required.

No person known as a bootblack or as a newsboy shall ply his trade or business in any of the streets, avenues or other public places in the city without a permit from the bureau of licenses, issued as hereinafter provided. (Rules of Bd. of Ald., ch. 2, r. 1; Rev.Ords.1946, ch. 19, § 11)

Sec. 14-44. Prerequisites to issuance of permit.

No permit hereunder shall be issued to a bootblack or newsboy until the parent or guardian of the applicant for such permit, if the applicant is a minor, or some other person approved by the chief of police, if the applicant is an adult, shall give to the chief of police satisfactory assurance of the good character of such applicant. (Rules of Bd. of Ald., ch. 2, r. 2; Rev.Ords.1946, ch. 19, § 12)

Sec. 14-45. Issuance of permits to persons over sixteen years of age.

The bureau of licenses is hereby authorized to grant permits in writing to bootblacks and newsboys over the age of sixteen (16) years to ply their trade or business in the streets, avenues and other public places of the city. (Rules of Bd. of Ald., ch. 2, r. 2; Rev.Ords. 1946, ch. 19, § 12)

Sec. 14-46. Issuance of permits to persons not over sixteen years of age.

The truant officer is hereby authorized to grant permits in writing to bootblacks and newsboys not exceeding the age of sixteen (16) years, to ply their trade or business in the streets, avenues and other public places of the city.

State law reference—By virtue of P.L. 1915, c. 1264, the truant officer issues permits for children sixteen and under.

Sec. 14-47. Renewal of permit.

All permits granted under this article shall be renewed annually. (Rules of Bd. of Ald., ch. 2, r. 2; Rev.Ords.1946, ch. 19, § 13)

Sec. 14-48. Badges.

The bureau of licenses shall deliver to each person receiving a permit, a numbered badge made of metal. Said badge shall be and remain the property of the city, and the person receiving the same shall return the same, or cause the same to be returned, to the bureau of licenses at the expiration of the time for which said permit was granted, or at the time of the revocation of said permit, if sooner revoked. (Rules of Bd. of Ald., ch. 2, r. 3; Rev.Ords.1946, ch. 19, § 14)

Sec. 14-49. Deposit for badge.

A deposit of fifty cents ($.50) shall be made upon the issue of a badge to the holder of a permit hereunder, which deposit shall be returned when the badge is surrendered or the permit is revoked. (Rules of Bd. of Ald., ch. 2, r. 4; Rev.Ords.1946, ch. 19, § 15)

Sec. 14-50. Badge to be worn.

Each person to whom a badge is issued under section 14-48 shall, while plying his trade or business, wear said badge on the front of his hat or cap in such manner that said badge may be plainly seen. (Rules of Bd. of Ald., ch. 2, r. 4; Rev.Ords.1946, ch. 19, § 15)

Sec. 14-51. Record of permits, badges to be kept.

The bureau of licenses shall endorse the number of the badge issued hereunder upon the permit issued hereunder, and shall keep a correct record of the name of each person to whom a permit is granted, together with his place of residence, the trade or business to be pursued under said permit, and the number of the badge delivered to the permit holder. (Rules of Bd. of Ald., ch. 2, r. 3; Rev.Ords.1946, ch. 19, § 14)

Sec. 14-52. Revocation of permit.

The bureau of licenses may in its discretion at any time revoke any permit granted as provided herein; and it shall be deemed sufficient cause for such revocation, that the person whose permit is revoked has been guilty of using indecent or profane language, or of violating any existing rule for regulating or restraining bootblacks or newsboys, or of committing any act of a disorderly or dishonest nature. (Rules of Bd. of Ald., ch. 2, r. 5; Rev.Ords.1946, ch. 19, § 16)

Sec. 14-53. Noise prohibited.

by the City of Providence, Rhode Island, to enjoin pending and future prosecutions by defendants under said ordinance and to enjoin the defendants from otherwise interfering with activities of the plaintiffs that are protected by the First and Fourteenth Amendments to the Constitution of the United States.

## JURISDICTION

The jurisdiction of the court arises under 28 U.S.C. §§ 1343, 2201 and 2202.

## CASE OR CONTROVERSY

 Defendants have argued that plaintiffs' case must be dismissed in that plaintiffs have never applied for permits, and not having so applied, do not now present a fully ripened controversy for the court to decide. Phrased differently, defendants say, and the record supports, that had plaintiffs applied for the permits, they would have received them, thus rendering this law suit unnecessary. Defendants' principal reliance is upon Kingsley Inter. Pic. Corp. v. City of Providence, R. I., 166 F.Supp. 456 (D.R.I.1958) in which a three-judge federal district court dismissed an equity suit challenging the constitutionality of Providence's motion picture licensing statute. The court there stated at p. 460:

"It would be an unwise and injudicious act on our part to hold legislation unconstitutional where the complaining party may not be adversely affected by such legislation."

Of course, in the instant case certain of the plaintiffs claim already to have been adversely affected by the ordinance here in question in that they have been arrested and prosecuted for violation of it. Clearly, it would be permitted them to raise the unconstitutionality of this ordinance in defense to the criminal charges brought against them, nothwithstanding their failure to have applied for

the licenses. See Staub v. Baxley, 355 U.S. 313, 319, 78 S.Ct. 277, 2 L.Ed.2d 302 (1958); Lovell v. Griffin, 303 U.S. 444, 452–453, 53 S.Ct. 666, 82 L.Ed. 949 (1938). Their prosecutions having been commenced, it would seem strange to deny them the standing in a federal equity suit which they would clearly have in their state criminal suit. See Russo v. Reed, 93 F.Supp. 554, 558 (D.Me.1950). Moreover, it would appear now to be settled that where a state statute is attacked for facial unconstitutionality by virtue of a First Amendment violative licensing procedure, there is no need to resort first to the very scheme sought to be held unconstitutional. Shuttlesworth v. Birmingham, 394 U.S. 147, 151 & n. 3, 89 S.Ct. 935, 22 L.Ed.2d 162 (1969). See City of Chicago v. Atchison, Topeka & S. F. Ry. Co., 357 U.S. 77, 89, 78 S.Ct. 1063, 2 L.Ed.2d 1174 (1958). The court therefore holds that plaintiffs have presented a sufficiently crystallized controversy to require this court to adjudicate, inter. alia, the constitutionality of the Providence newsboy's permit ordinance.

Since this is an attack for facial unconstitutionality, the court will first present its conclusions of law as to this facet of the case.

## CONSTITUTIONALITY OF THE ORDINANCE

 Plaintiffs argue that the prior restraint effectuated by the Providence newsboy's permit ordinance on the exercise of their First Amendment right to distribute the news is unconstitutionally overbroad and vague and embodies a direct impermissible restraint upon the peaceable and orderly exercise of essential free press rights. Defendants argue that it is within the police power to require the granting of permits to newsboys and that the Providence newsboy's permit ordinance, if narrowly construed, is a reasoned means to accomplish the

It shall be unlawful for any newsboy to hawk or make any noise on any street or other public place in the city on Sunday for the purpose of selling any newspaper or other article. (Rules of Bd. of Ald., ch. 2, r. 7; Rev.Ords.1946, ch. 19, § 17)

Cross reference—Noise prohibited, § 16–10 et seq.

Secs. 14–54—14–63. Reserved."

police power purpose of newsboy identification.

■■ That the distribution of news constitutes an essential and important facet of the operation of a free press is too fundamental to require citation. So too is it certain that the regulation of the streets of a city is a fundamental constitutionally permissible concern of city governments. However, it is in no sense certain that this Providence newsboy's permit law genuinely regulates the use of the streets—certainly it includes no language regarding time, place, or manner of distribution. Instead, it requires all newsboys as a condition precedent to the right to distribute news to file for a permit. What legitimate interest of the city is served by the identification of newsboys? Defendants point to Manchester v. Leiby, 1 Cir., 117 F.2d 661, 666 (1941) to support their claim that the protection of purchasers of newspapers from fraudulent solicitation is a reasonable police purpose. If that be the purpose of this ordinance then, of course, Martin v. City of Struthers, 319 U.S. 141, 147, 63 S.Ct. 862, 87 L.Ed. 1313 (1943), decided after Leiby, makes it indisputably clear that alternative measures, less inhibitory of First Amendment rights, exist to accomplish the purpose. There, the Court, speaking of a handbill distribution ordinance, said at p. 147, 63 S.Ct. at p. 865:

> "The dangers of distribution can so easily be controlled by traditional legal methods, leaving to each householder the full right to decide whether he will receive strangers as visitors, that stringent prohibition can serve no purpose but that forbidden by the Constitution, the naked restriction of the dissemination of ideas."

See Comment: Less Drastic Means and the First Amendment, 78 Yale L.J. 464, at 469 and footnotes 26 and 27 (1969). Additionally, the use of identification permits as a regulatory process in the distribution of news, sanctioned by Leiby appears to have been condemned by the subsequent Supreme Court decision in Thomas v. Collins, 323 U.S. 516,

538–543, 65 S.Ct. 315, 89 L.Ed. 430 (1945). It is true that the Court there dealt with a labor union solicitors' registration requirement. But, that affords no distinction to this case, for the Court there acknowledged Texas citation of and reliance upon Leiby and went on to rule on the registration requirement in generic terms applicable to permit laws bearing directly upon the exercise of First Amendment rights.

Finally, even if it be assumed that Leiby retains some vitality after Martin v. City of Struthers, supra and Thomas v. Collins, supra, there is the still further vice of this ordinance, as distinguished from the New Hampshire ordinance at issue in Leiby, that it allows a discretionary judgment of the "good character" of the permit applicant as a condition precedent to the granting of the permit. This vague category brings this case directly into the long line of Supreme Court decisions dealing with similar vague permit laws and renders this Providence Ordinance unconstitutional on its face. E. g., Lovell v. Griffin, 303 U.S. 444, 58 S.Ct. 666, 82 L.Ed. 949 (1938). See Shuttlesworth v. City of Birmingham, 394 U.S. 147, 151 and note 3, 89 S.Ct. 935, 22 L.Ed.2d 162 (1969).

Accordingly, I declare the Providence newsboy's permit ordinance unconstitutional as an impermissible direct restraint upon freedom of press and as a licensing scheme which vests overly broad and vague discretionary powers in the Chief of Police and the members of the licensing bureau.

## ABSTENTION

■ The court has been requested by the defendants to abstain on the issue of the unconstitutionality of the ordinance in question in order to permit the Rhode Island Supreme Court so to construe the ordinance as to avoid a holding of unconstitutionality. Of course, given the court's holding on the unconstitutionality of the ordinance under Thomas v. Collins, supra, and Martin v. City of Struthers, supra, there is no means by which

the Rhode Island Supreme Court could construe the ordinance, for even if the Court construed it to be a purely ministerial identification law, it would, nevertheless, violate the First Amendment. And, as was recently stated in *Karalexis et al. v. Byrne, et al.*, 306 F.Supp. 1363 (D.Mass.1969) (Three-Judge Court to Declare Massachusetts Obscenity Statute Unconstitutional), citing *Zwickler v. Koota*, 389 U.S. 241, 88 S.Ct. 391, 19 L.Ed.2d 444 (1967):

"* * * abstention may still be warranted if there is a reasonable likelihood that the state court may construe its statute so as to avoid constitutional issues, but abstention is not appropriate simply to allow the state court to be the one to decide the statute's basic conflict with the federal constitution." ·

Moreover, even if *Thomas v. Collins, supra*, and *Martin v. City of Struthers, supra* do not render this statute unconstitutional, the Rhode Island Supreme Court could not save the ordinance, as did the New Hampshire Supreme Court in *Cox v. New Hampshire*, 312 U.S. 569, 61 S.Ct. 762, 85 L.Ed. 1049 (1941) for to do so the court would have to ignore totally the "good character" condition, a condition which was not present in the New Hampshire law. Finally, there is the possibility that abstention may be wholly inapplicable where the asserted claim is one of First Amendment violation under the Civil Rights Act, 42 U.S.C. § 1983. See *Landry v. Daley*, 288 F.Supp. 200, 209–212 (N.D.Ill.1968). See generally Note: Federal Question Abstention: Justice Frankfurter's Doctrine in an ·Activist Era, 80 Harv.L.Rev. 604, 607–613 (1967).

## INJUNCTIVE RELIEF AS TO THE ORDINANCE

■ Where First Amendment challenge is made to a state law and it is declared that the law is unconstitutional as vague or overly broad, and where, as of the time of filing the federal action, state court criminal prosecutions are proceeding and threats of arrest under state law have been made, there is sufficient irreparable injury. to enjoin all future arrests and threats of arrest, notwithstanding that past arrest and pending prosecutions have been made in good faith. *Dombrowski v. Pfister*, 380 U.S. 479, 483–489, 85 S.Ct. 1116, 14 L.Ed.2d 22 (1965). *Landry v. Daley*, 288 F.Supp. 200, 215 (N.D.Ill.1968). As is apparent, this court has declared the Providence ordinance unconstitutional as both vague and over-broad. As of the time of the filing of this action, four arrests had been made and several arrests were threatened. Conceding the issue of good faith application of the ordinance to the defendants, an injunction against future arrests and threats of arrest is nonetheless warranted.

The more difficult question, which has not yet been decided in this Circuit but which has divided certain of the other Circuits, is whether 28 U.S.C. § 2283, the federal anti-injunction statute, is· a bar to injunction against pending state criminal proceedings for violation of a statute declared to be unconstitutional as violative of the First Amendment in a federal action under 42 U.S.C. § 1983. This case presents that question squarely because the court has been asked to enjoin the pending prosecutions of three of the instant plaintiffs, two of whom have been charged and are awaiting trial in Providence municipal court, one of whom has been convicted there and is appealing to Superior Court. The court has read the many decisions dealing with this issue and without laboring to set out what so many others have so well discussed, the court holds that 42 U.S.C. § 1983 is an "express authorization" within the meaning of 28 U.S.C. § 2283 for the reasons stated in *Landry v. Daley*, 288 F.Supp. 200, 221–225 (N.D. Ill.1968). Accordingly, the court enjoins the prosecution of the two cases now pending in the Providence municipal court and the case pending appeal to the Superior Court from a conviction in the Providence municipal court. See *Landry v. Daley*, 288 F.Supp. 200, 206 and notes 22–24 (N.D.Ill.1968).

The court will now set forth its findings of fact and conclusions of law pertaining thereto as the same may be required.

## FINDINGS OF FACT

■ None of the plaintiffs have applied or as of the date of the trial of the issues involved, have ever applied or intend to apply for a permit to sell newspapers as required by the ordinance, *supra*, though they would have received the same had they done so. They make certain factual contentions, namely, that they are being harassed by the police because of their association with the newspaper, EXTRA; the ordinance in question is being selectively enforced as to them; and that the Commissioner of Public Safety is arbitrarily denying to their reporters press passes in the same proportionate numbers he issues to reporters of other newspapers. In substance. it is contended that the ordinance has been employed by the defendants as part of a pattern or practice to deny the plaintiffs freedoms of speech, press, and association by discouraging people from associating with EXTRA as sellers, staff members or in any other capacity. The court will discuss each of these positions separately.

## HARASSMENT

The paper in question is a weekly started in October of 1968 by a group of young people with a life style unique to the accepted norms of society. There is no structure to its operation usual to a business enterprise whether incorporated or not with either a de facto or de jure head or manager. Indeed, it is apparent from the record this modus operandi is quite intentional not only in the gathering and printing of the news but also in the sale of the paper itself. Ad hoc groups or individuals obtain papers each day which they attempt selling in the heart of the City of Providence, more especially in a four block area commonly referred to as the Mall, and several of the university campuses. Evidently, no records for each of them is kept and it appears it matters not who or when they present themselves to act as newsboy sellers. The personnel are overwhelmingly of an obvious different culture to that which most of us have embraced, and their association with the paper is transient and indefinite. The EXTRA bookkeeper and certain other witnesses testified that EXTRA is a "street newspaper" dependent for its existence upon street sales requiring numerous street vendors willing to sell in downtown Providence. The evidence shows that there are now about ten staff members termed full time with others who work more or less regularly and an ever changing group of sellers who occasionally report to sell the papers.

Four vendors, Messrs. Joseph M. Arsenault, Roger Friedman, Daniel W. Beckel and John A. Merle were arrested on September 27, 1969, November 7, 1969, November 25, 1969, and December 11, 1969, respectively, while selling EXTRA for violation of the newsboy ordinance which prosecutions are still pending. Mr. Arsenault on August 31, 1969 was also arrested for standing " * * * on the sidewalk * * * in the City of Providence so as to obstruct a free passage for foot passengers, and did disturb and annoy passersby and persons residing in the vicinity thereof." (This charge is commonly referred to as "loitering.") The unrebutted testimony of his attorney in the non-jury trial of said case is that he was found not guilty based on the court finding that he was selling the newspaper EXTRA, which conduct did not constitute a violating of said charge. With the exception of these four cases, there have been no arrests for violation of the ordinance in question for the past thirty years though it is unassailable that in the City of Providence there are newsboys selling other papers without a permit.[2]

---

2. See discussion of testimony under Selective Enforcement, infra.

The specific instances of alleged harassment are unconvincing in the first instance and in the main have been well explained and rebutted by the defendants. The court will discuss the more notorious of those presented.

The plaintiffs contend that on one occasion, Mr. Bickel, together with a Miss Marion Fish, as EXTRA reporters, were trying to cover a story at Hope Street High, a public school in the City of Providence, and that Bickel was arbitrarily removed and taken to the police station without justifiable cause. The nuance of the direct testimony created a false picture of the actual events. Cross examination and rebuttal conclusively proved that the school, which had been subjected to serious race riots, was at the time closed for classes but was being used as a situs for conferences with all affected personnel. Security measures were being employed to admit access only to the news media and participating officials. Mr. Bickel and Miss Fish were both permitted entrance beyond the police lines and together with other reporters remained therein until such time as Mr. Bickel attempted to break into a closed meeting then in progress; as a result, he was again asked to produce his press card which he had used to gain admittance to the building and when he refused to identify himself as the person whose name appeared thereon, he was taken to the police station though Miss Fish was permitted to remain.

The press card being used was one of two that had been issued to other reporters of EXTRA and was in direct violation of the conditions on which it was given as printed on the reverse side thereof, that it was for the exclusive use of the person whose name appeared thereon. It can hardly be denied that the sensitiveness of the situation at hand required the police to do nothing less.

The incident recited by the plaintiffs of police indifference and levity toward a housebreak at the apartment occupied by certain members of the paper in question is without merit and if not so accentuated and relied upon by the plaintiffs, it would not be worthy of comment by the court.

Miss Fish testified that when police arrived after she reported a break into the apartment, they exhibited an indifferent attitude and seemed more interested in commenting on birth control pills they saw on the table and uttering unsavory comments about her personal conjectured behavior. On the other hand, the policeman concerned, convincingly testified how this was a routine call, as in all other cases, for the purpose of a preliminary report to be submitted for further investigation to the detectives. He determined the intruder's means of access, the amount of money missing and in the normal course of business, submitted said report to the detectives for further investigation. They in turn testified as to their inability to make contact with Miss Fish by phone and it avails the plaintiffs nothing to argue no reasonable attempt was made since they did not call the EXTRA office where she allegedly worked.

The case is still open on the books necessarily bogged down with the hundreds of other open cases assigned to the detectives of this particular area. It is akin to the indefatigable judge inundated by an impossible calendar beyond any reasonable possibility of disposition within a set time span. I utterly reject the plaintiffs' position in this regard.

There were other experiences related in court, one of which concerned a girl associate of the paper being followed in the City of Providence in the downtown district during business hours by policemen who continued to utter obscenities to her. If this court is to evaluate witnesses as observed on the stand in their manner of testifying and demeanor, it simply disregards this portion of the transcript.

Robert Leach testified he was covering a rally and after taking pictures, some several blocks from the scene, he was accosted by two men in a car he believed to be detectives because he saw their guns and the usual equipment of an unmarked police car. They demand-

ed his camera and film whereupon he exposed it rather than give it to them. In cross examination, he admitted, however, that he had no problems at the rally and that for two and one-half hours he was not prevented from having full and free access to the entire event. I do not accept the complained of incident though it does remain unrebutted. The severity of the charge requires closest scrutiny of the evidence which I do not find of such sufficient probative force.

The dismissed charge of loitering as hereinbefore recited is not accepted as evidence of harassment any more than this court can make a conclusion of police benevolence based on Mr. Arsenault being stopped for driving without a license and not charged as testified to by one of the defendants' witnesses.

A number of EXTRA sellers stated that on numerous occasions they were warned they needed a license and as a consequence curtailed their activities or resorted to surreptitious means to sell the paper. None of these contended there was anything more than a simple warning that there was an ordinance requiring such a license which had to be obtained.

It is abundantly clear from the record that excepting the four arrests above recited, none of the "ever changing" group of about 50 sellers were even arrested or in any way molested by the police other than be told they were operating without the required permit even though their activities were daily conducted in the very center of the city. One could not imagine a more benevolent attitude than that of Officer Peter Simons, assigned to the Mall area, who by the plaintiffs' own admission saw them repeatedly violate the law and suggest, more than warn, that they get a newsboy permit. Indeed, in violation of what may be termed good police practice, the plaintiffs themselves acknowledged that on occasions he alerted them to detectives who might be in the area and for them to be on their guard.

The court will treat specially one unrebutted instance of unquestioned deprivation of the plaintiffs' civil rights.

The plaintiffs contend that late one evening, three of them were arrested without cause on the Mall in the City of Providence, abused and manhandled by the police who heaped invectives upon them as persons associated with EXTRA. As against this, there is the testimony by one of the three involved that the very next day he sold his papers in the vicinity of the very area, in the plain sight of policemen, freely and without molestation of any kind. However, it must be noted the actual Mall incident itself remains unrebutted, and I find this most disturbing, for the witness gave detailed testimony and specifically identified the policeman involved through Badge Number 383. It is difficult for this court to understand the defendants' failure to have such policeman testify in rebuttal. It must be inferred, applying well established rules of evidence, that had he been called, his testimony would not have been favorable to the defendants.

The police of a community are part of our system of justice in daily contact with the public. There is no dramatic contest between society and law enforcement personnel who are charged with enforcing the law which they do not enact and maintaining order. Of course, they do not possess unlimited powers to deter or reduce disobedience and the exercise of personal discretion is an inescapable part of their job.

However, deprivation of civil rights demands immediate and unqualified redress. The federal court has power to vindicate such wrongs by employing mandatory injunctive procedures against the officials involved. See Lankford v. Gelston, 4 Cir., 364 F.2d 197.

The Mall arrest incident was a deliberate unwarranted police act and as to the same, the court declares it to have been, at the very least, a violation of the plaintiffs' First Amendment rights, and the court grants declaratory relief.

However, it refrains from injunctive action believing as it does that the police officials in the instant case in the light of the court's declaration do not need the coercion of injunctive relief.

As Judge Soboleff said at page 203, Lankford v. Gelston, *supra*:

"It would not have been too much to expect in these circumstances a forthright statement that officers conducting such illegal searches in the future will subject themselves to disciplinary action."

See generally Comment: The Federal Injunction as a Remedy for Unconstitutional Police Conduct, 78 Yale L.J. 143 (1968). This ruling is confined to this isolated act of police harassment.

In the case at bar, excepting the unrebutted instance above recited, the police acted commendably and the court finds that the charge of police harassment is baseless. As to all other evidence, there was an unconvincing testimonial presentation by the plaintiffs which if not totally evidenced by the spoken word as recorded was manifest to me in their courtroom demeanor.

. Police transgressions by acts of harassment can't ever be condoned. This court quite agrees that, "where the police violations fall evenly upon residents of the community, everyone's security is threatened. Where as is often the case, police misconduct focuses largely on classes of people who are politically powerless to protect themselves, the Constitution's promise of equal protection is mocked, and a community is divided into those whom the police protect and those whom the police victimize." Comment: The Federal Injunction as a Remedy for Unconstitutional Police Conduct, The Yale Law Journal, Volume 78, Number 1, November, 1968 at page 143. Such police misconduct must be redressed and deterred. However, the enthusiastic support for even-handed justice and jealous perpetuation of constitutional rights does not place in imbalance the court's sacred responsibility in the weighing of the testimony. This, of course, becomes particularly acute where it stands unrebutted. Such status, however, does not automatically give it an imprimatur of conclusive truthfulness. Though it is assumed such witness speaks the truth such assumption may be dispelled by his testimonial conduct. In the light of all the testimony given, the circumstances, and every matter in evidence including the demeanor of the witnesses, their relation to each other, and motives, I cannot accept as factually accurate or true the uncontradicted testimony excepting that of the Mall arrest incident.

I find there was infinite tolerance by the police to the sale of EXTRA and a conscious regard to a delicate situation in one of the busiest sections of the City of Providence.[3]

## SELECTIVE ENFORCEMENT

The evidence in support of the plaintiffs' allegations that the City acted in bad faith by selectively enforcing the ordinance against the EXTRA newspaper, while not enforcing it against other newsboys plying their trade in city streets, is clearly on the record and leaves little or no room for debate. It may be itemized as follows:

1. Five hundred and sixty-two newspaperboys are employed to distribute in the city, the largest daily newspapers, The Providence Journal and Evening Bulletin. They work through fourteen distributors making house to house deliveries on a financial arrangement with said distributors. The plaintiffs contend they fall within the permit requirement of the ordinance whereas the de-

---

3. See also Cameron v. Johnson, 390 U.S. 611, 617–622, 622–628, 88 S.Ct. 1335, 20 L.Ed.2d 182 (dissenting opinion, Fortas, J.) and Zwicker v. Boll, 391 U.S. 353, 353–358, 88 S.Ct. 1666, 20 L.Ed.2d 642 (dissenting opinion Douglas, J.); Discriminatory Law Enforcement and Equal Protection from the Law, 59 Yale L.J. 354; The Challenge of Crime in a Free Society: A Report by the President's Commission on Law Enforcement and Administration of Justice, Ch. 4 "The Police" pp. 104–106 (1967).

fendants contend they do not come within the ambit of the ordinance since theirs is a contractual delivery arrangement with the distributors and they are, therefore, distinguishable from the street sellers dependent on transient customers.

2. About twenty-eight to thirty boys sell The Providence Journal and Evening Bulletin on streets in the downtown area.

3. There are twelve outstanding permits.

4. No arrests excepting the four detailed in this case for selling EXTRA have been made during the past 30 years.

5. No substantial evidence that these boys selling The Journal and The Bulletin have been seen wearing their badges or displaying their permits and thus being warned for failure to do so.

The inescapable conclusion is that even accepting the defendants' interpretation of "newsboy" there are a number selling The Providence Journal and Evening Bulletin without compliance with the ordinance in question and without police intervention of any kind.

Though there is no allegation encompassing the equal protection clause, I feel constrained, however, in the interest of completeness to make findings of fact in this matter.

In the light of the unimpeachable testimony of police conduct in permitting the sales of EXTRA by the "ever changing" 50 or more sellers and the explainable conduct of law enforcement as to the other incidents, nothing remains as to this facet of alleged bad faith enforcement but statistics.

■ I discount the five hundred sixty-two delivery boys as being similarly engaged as the class of EXTRA—I accept they are in a different category engaged in delivery of papers rather than being street sellers of papers. In the absence of legislative definition, this court determines "newsboy" within the intent and meaning of the ordinance in question to be one who is a seller of newspapers and all like articles from the public streets, avenues and other public places of the City of Providence. The Bureau of Licenses is correct in applying the ordinance within this context of meaning.

In the instant case, therefore, there remains the evidence of the four arrests herein recited as against no arrests of perhaps sixteen or so newsboys of other papers plying their business without a license.

This is not unlike the case of Moss v. Hornig, 2 Cir., 314 F.2d 89 involving a Sunday Closing Law. Speaking of the plaintiffs' contentions, the court stated at page 93:

"He evoked testimony that only two persons, including himself, had been prosecuted in the Third Circuit since 1961, that Hornig (the prosecuting attorney who filed the information against the plaintiff storekeeper for violating the State Sunday Closing Law) knew other stores were open, and that Hornig failed to bring other prosecutions. These facts do not prove purposeful discrimination."

At page 92 the court stated:

"Mere failure to prosecute other offenders is no basis for a finding of denial of equal protection. See United States v. Rickenbacker, 309 F.2d 462 (2 Cir. 1962). To show that unequal administration of a state statute offends the equal protection clause one must show an intentional or purposeful discrimination. Snowden v. Hughes, 321 U.S. 1, 8, 64 S.Ct. 397, 88 L.Ed. 497 (1944)."

"In Oyler v. Boles, 368 U.S. 448, 456, 82 S.Ct. 501, 505, 7 L.Ed.2d 446, (1962), the Supreme Court rejecting petitioner's contention that the selective enforcement of the West Virginia habitual offenders penalty statute was a denial of his right to equal protection said:

'(T)he conscious exercise of some selectivity in enforcement is not in itself a federal constitutional violation. Even though the statistics in this case might imply a policy of se-

lective enforcement, it was not stated that the selection was deliberately based upon an unjustifiable standard such as race, religion, or other arbitrary classification.' "

There is nothing in the record showing a purposeful or intentional discrimination against the plaintiffs by the defendants. On the contrary, the Commissioner of Public Safety as well as the officers who testified unequivocally denied the existence of any law enforcement or prosecutorial instructions to the police targeting the plaintiffs specially.

I reject the plaintiffs' contention of selective bad faith enforcement.

## PRESS PASSES

The court has considered the plaintiffs' claim regarding the conduct of Commissioner Goldstein with respect to the issuance of press passes.

The court orders the parties to submit briefs within ten days from the date of this opinion on the First Amendment issue raised in this respect and hereby reserves decision thereon.

## JUDGMENT

The court, having reserved decision as to press passes, pursuant to Fed.R.Civ. P. 54(b), it hereby certifies that there is no just reason for delay as to all other matters. It hereby directs that judgment be entered for the plaintiffs as to the constitutionality of the ordinance and the injunctive relief sought as to both future arrests and pending prosecution.

## SUPPLEMENTAL OPINION

These are several matters remaining open in this civil rights suit.

As to the decision rendered on January 13, 1970, defendants have moved to amend judgment, which was entered on January 23, 1970, as to paragraph no. 3 of said judgment; plaintiffs have moved for specific findings of fact as to the incident involving Mary Jane Simpson. Finally, both parties have briefed the legal and factual issues relating to the issuance of press passes by the defendant Commissioner of Public Safety, issues expressly left open by this court in its prior decision.

### Rule 59(e) Motion to Amend Judgment

Paragraph 18(a) (2) and 18(c) both seek injunctive relief from harassing conduct of the defendants as to the plaintiffs in their First Amendment rights. The court found that there was no concerted harassment of the plaintiffs by the defendants. However, in reviewing the incidents of harassment, the court did find the so-called "Mall incident" a violation, at the least, of the plaintiffs' First Amendment rights. That incident is certainly covered by the broad language of the previously cited paragraphs, and defendants were completely on notice throughout the trial of the incidents alleged by plaintiffs. Motion denied.

## THE PRESS PASSES

### Findings of Fact

Certain public happenings tend to cause crowds to gather or are otherwise dangerous to the public by virtue of their propensity to personal injury. In Providence, as a matter of custom, members of the press are permitted into the zone of police protection established about the surroundings of such events. The means of identification for access to such events is a so-called "press pass" a small card issued, in accordance with a long-standing custom or usage, by the Commissioner of Public Safety to those whom he knows to be members of the press. The source of the Commissioner's power to issue or deny such passes is presumed by the Commissioner to be his general authority to regulate the public safety.

The system of press passes is one of long standing and has existed without any published specified guidelines, rules or regulations. However, the present Commissioner of Public Safety testified that he does employ certain guidelines in determining eligibility for such passes, namely, verification of

a) the identity of the individual applicant, and

b) his service to a publication.

In February of 1969, two members of EXTRA (Arnold E. Strasser and Thomas Feeney) who personally called at the Commissioner's office seeking passes, met with him and after discussing the paper in question and "some of the issues involved" were each given one. The Commissioner testified that in the course of this meeting, he determined that both these people were what might be regarded as permanent members of EXTRA. However, he could not determine its organization which was neither a corporation nor a partnership but appeared to be a loosely run personnel-varying association of people.

Undoubtedly, the Commissioner's conclusions as to the paper in question were consonant with this court's finding as to the same recited in its opinion of January 13, 1970.

"The paper in question is a weekly started in October of 1968 by a group of young people with a life style unique to the accepted norms of society. There is no structure to its operation usual to a business enterprise whether incorporated or not with either a de facto or de jure head or manager. Indeed, it is apparent from the record this modus operandi is quite intentional not only in the gathering and printing of the news but also in the sale of the paper itself. Ad hoc groups or individuals obtain papers each day which they attempt selling in the heart of the City of Providence, more especially in a four block area commonly referred to as the Mall, and several of the university campuses. Evidently, no records for each of them is kept and it appears it matters not who or when they present themselves to act as newsboy sellers. The personnel are overwhelmingly of an obvious different culture to that which most of us have embraced, and their association with the paper is transient and indefinite. The EXTRA bookkeeper and certain other witnesses testified that EXTRA is a 'street newspaper' dependent for its existence upon street sales requiring numerous street vendors willing to sell in downtown Providence. The evidence shows that there are now about ten staff members termed full time with others who work more or less regularly and an ever changing group of sellers who occasionally report to sell the papers."

Subsequent to this February meeting, a letter was received by the Commissioner on an EXTRA letterhead unsigned, without an address excepting post office box number, listing about twenty-three names for whom passes were being requested.

Since no addresses and other identification were given for the people in question, this letter was filed without action.

Following this correspondence, a phone call was received from some member of EXTRA inquiring about the passes and was told additional information was needed; that no passes would be issued until the Commissioner received identifying information concerning the people for whom the passes were being requested and until he knew the "people who were making this request."

Subsequently, a list of twenty-five to thirty names with addresses was received by the Commissioner. Most of these, however, could not be checked out and verified. To quote the Commissioner, he stated:

"I checked the directory. I could not find most of them that I checked. I simply, frankly, felt they were not doing what I felt was necessary for them to get a pass and Mr. Strasser and Mr. Feeney both knew that when they walked in there (February meeting) and they got their passes. Anyone that wants them can get them by stating their name and by saying who they are and that they are members of EXTRA."

On October 15, 1969, another letter was received with only thirteen names and it should be noted that this last

list had only seven names common to the first. In other words, within a span of a few months, EXTRA was no longer seeking passes for sixteen of the individuals originally listed. Once again, this last letter did not give the addresses and was not answered by the Commissioner because he felt he was not getting adequate information.

It appears that the Commissioner did not require, in all cases, that the applicant for the pass personally apply for the same at his office. He further testified that as to the other news media, namely The Providence Journal, the city's only major newspaper, and the Brown Daily Herald, the newspaper of one of the city's prestigious private universities, he accepted letters of verification from the editor of The Providence Journal and dean of the university as sufficient verification of the identity of their personnel seeking press passes. On the other hand, he stated that if Mr. Strasser of EXTRA whom he had personally met sent him a similar letter for the issuance of a pass to a named individual, he would not do it.

He explained this by saying it could be assumed that the dean of the university and editor of The Providence Journal, by reason of their known position and their respective organizations and the business practices employed, reliably identified and verified the individuals they listed, whereas, this could not be assumed for EXTRA.

### Legal Discussion

The plaintiffs allege that the custom or usage by which press passes are issued is unconstitutional, apart from its application in this case, because it is both vague, overbroad and offensive to the First Amendment. They furthermore allege that the defendant Commissioner's application of the custom or usage to them was violative of the First Amendment because it limited, in fact, their free press rights. Finally, they argue that the Commissioner's action as to them was different from his action

as to other similarly situated press pass applicants and hence violated the equal protection clause of the Fourteenth Amendment. The defendants contend that press pass custom or usage is a privilege within the discretion of the Commissioner, that its exercise on these facts was reasonable and hence neither discriminatory nor violative of the First Amendment.

 The issuance or denial of press passes is within the general authority of the Commissioner to protect the public safety, and press passes per se are a reasoned police regulation related to the state's interest in safety at a time and place of public crisis. Nevertheless, because such regulation imposes a burden not only upon the vital news-gathering function of the free press but also upon the right of the general public to travel on the public way, it must contain clear and narrow guidelines. See Shuttlesworth v. City of Birmingham, 394 U.S. 149 at 150–151, 89 S.Ct. 935, 22 L. Ed.2d 162 (1969); Niemotko v. State of Maryland, 340 U.S. 268, 71 S.Ct. 325, 95 L.Ed. 267 (1950); Kent v. Dulles, 357 U.S. 116, 78 S.Ct. 1113, 2 L.Ed.2d 1204 (1958). If identification of members of the press is to be the sole governing criterion and if, upon identification, passes will issue ministerially, then that should clearly be stated and made known. It is not necessary that there be a written regulation, so long as there is a uniform practice under the broad general authorization. The determination of whether or not a uniform practice has been employed is dependent on an understanding and analysis of the existent factual situation and the undeniable conclusions which which can be drawn therefrom. In this context, I find a uniform practice has been shown. The custom or usage employed does not violate the First and Fourteenth Amendments as vague, overbroad and offensive.

 The non issuance of passes is attributable solely to plaintiffs' conduct in failing to comply with the reasonable requirements explained to them.

It may be argued that the Commissioner failed to answer the plaintiffs' correspondence and does not explain his failure to issue passes to those persons whose names were common to all the lists or those persons whose addresses he was able to determine.

The simple answer is there was no legal obligation on the Commissioner to engage in a running exchange of correspondence with the plaintiffs once he had made known the requirements for the issuance of the passes in question. The facts show that just such information had been conveyed to them in the phone call following receipt of the first correspondence after the February meeting and in the conduct of the Commissioner in issuing passes to two of the individuals of EXTRA who personally called and made their identity and work known.

The Commissioner's refusal to accept the correspondence from EXTRA as to those persons whose addresses he was able to determine unlike his treatment of letters from the editor of The Providence Journal and the dean of the university as to the Brown Daily Herald remains to be discussed. Facially this creates the impression of preferential treatment subjecting EXTRA personnel to arbitrary discriminatory practices violative to the core of the constitutional claims made. However, to accept so veneer an impression would be a disservice to the defendants and a distorted application of the constitutional principle involved. Should the Commissioner have closed his eyes to the obvious and self-admitted loose functioning of EXTRA's operation undoubtedly priding itself on its intentional lack of organization and responsible titular head? Could he in good conscience place any merit on the letters received, pregnant with inaccuracies, if not outright unidentifiable or false names, emanating from some unknown non responsible person? These letters evidenced a casual regard for the passes in question and show they were sought in a careless and indifferent manner.

Certainly it would not be for the Commissioner to evaluate the writer of the EXTRA letter if he were in the same position relative to his paper as the dean to the Brown Daily Herald and the editor to The Providence Journal. This fact simply does not exist and it cannot be said, therefore, that the Commissioner was being heavy handed and arbitrary. It cannot be said he was treating EXTRA in any manner different from other news media. The Commissioner had made it clear he wanted to know who was making the request. EXTRA was not doing this.

 This Court fully realizes that so sensitive an area as First Amendment access to news demands precise conduct of mature even-handed application on the part of the single person authorized to act. In the case at bar, it is the considered judgment of this court the Commissioner acted in just such a manner without any subjective overbroad exercise of discretion.

The court finds:

1) The custom or usage regarding the issuance of press passes in the City of Providence is declared not to be violative of the First and Fourteenth Amendments.

2) The action of the defendant Commissioner in refusing to issue press passes and in refusing to respond to the requests of the plaintiffs for press passes is declared not to be violative of the First and Fourteenth Amendments.

3) The Commissioner did not treat the plaintiffs differently than other newspapers with respect to applications for press passes and, therefore, did not violate the equal protection clause of the Fourteenth Amendment.

4) The plaintiffs' request for injunctive relief is denied.

An appropriate order reflecting the court's ruling will be prepared by the defendants.

*Mary Jane Simpson*

 This nineteen year old girl claimed to be a full time staff member of the plaintiff newspaper. She testified that though there was an office at 93

Clements Street, Providence, Rhode Island they, nevertheless, had two apartments at 124 Tell Street and complained of events that took place there on the evening of October 29, 1969 when two detectives entered the apartment without any apparent reason. She testified as to their conduct stating, when they were ordered to leave since they had no warrant, one of them commented, "That's alright, we know all about you EXTRA people." She also told of their remark of not being able to understand why she wanted to work for EXTRA.

There was defense testimony that police were sent to the address in question to check out a report that certain youngsters reported missing were in the apartments in question.

This needs little comment—the court rejects the plaintiffs' position and finds there was no police harassment.