GORSUCH, Circuit Judge,
dissenting.
The “knock and talk” has won a prominent place in today’s legal lexicon. . The term is used to describe situations in which police officers approach a home, knock at the front door, and seek to engage the homeowner in conversation and win permission to search inside. Because everything happens with the homeowner’s consent, the theory goes, a warrant isn’t needed. After all, the Fourth Amendment prohibits “unreasonable”, searches, and consensual searches are rarely that. No doubt for just this reason law enforcement has found the knock and talk an increasingly attractive investigative tool and published cases approving knock and talks have grown legion. But in the constant competition between constable and quarry, officers sometimes use knock and talks in ways that test the boundaries of the consent on which they depend. So, for example, courts have found that a homeowner’s consent isn’t freely given when officers appear with a display of force designed to overbear. See, e.g., United States v. Quintero, 648 F.3d 660, 670 (8th Cir.2011). Courts have found consent lacking and a constitutional violation, too, when officers mislead homeowners into thinking they have no choice but to cooperate. See, e.g., United States v. Harrison, 639 F.3d 1273, 1280 (10th Cir.2011).
Today’s case comes at us along similar lines but from ■ a different vector. A home’s curtilage — that area “immediately surrounding and associated with the home,” Oliver v. United States, 466 U.S. 170, 180, 104 S.Ct. 1735, 80 L.Ed.2d 214 (1984)—is protected' by the Fourth Amendment much like the home itself. So not only do officers need a warrant, exigent circumstances, or consent to enter a home, they also generally need one of those things to reach the home’s front door in the first place. Florida v. Jardines, — U.S. -, 133 S.Ct. 1409, 1414, 185 L.Ed.2d 495 (2013). Typically, of course, officers contend that .their intrusion into the curtilage for a knock and talk is justified by the homeowner’s implied consent. And usually there’s no question about it, for. the Supreme Court has recognized that the .“knocker on the front door” normally supplies an implied “invitation or license” for visitors of all kinds to enter the home’s curtilage and knock at the front door. Id. at 1415 (quoting Breard v. Alexandria, 341 U.S. 622, 626, 71 S.Ct. 920, 95 L.Ed. 1233 (1951)). By placing a knocker on the front door (or, I’m sure, a doorbell next to it), the homeowner is traditionally said to invite even “solicitors” and “hawkers” to “approach the home by the front path, knock promptly, wait briefly to be received, and then (absent invitation to linger longer) leave.” Id. For this same reason and to the same extent, the Court has explained, law enforcement agents, no less than anyone else, may approach the front door and seek entry. Id. at 1415-16.
But what happens when the homeowner manifests an obvious intention to revoke the implied license to enter the curtilage and knock at the- front door? When the owner literally substitutes the knocker with a No Trespassing sign, one smack in the middle of the front door? When she adds two more No Trespassing signs at the driveway’s mouth to the street, one on either side of the only clear access route from the street to the front door — and along the very route any visitor would use to approach the home? And when, for good measure, she posts still another No Trespassing sign between the driveway and the house? So that to enter the home’s front porch, its constitutionally protected curtilage, visitors would háve to disregard four separate and plainly visible warnings that their presence is wholly unwelcome? May officers stills — under these *1004 circumstances — enter the curtilage' to conduct an investigation without a warrant and absent an emergency?
That’s the question we’re asked to address today.' The district court upheld the officers’ conduct as consistent with the Fourth Amendment on the theory that a home’s front porch isn’t curtilage, so the officers who entered the porch to knock at the door in this case never stepped foot in a constitutionally protected space. On appeal, the government concedes that the district court’s reasoning is mistaken because a home’s front porch is, in fact, the “classic exemplar” of curtilage. Id. at 1415. Still, the government asks us to affirm the result the district court reached on either of two alternative grounds. My colleagues, in turn, don’t accept either of the government’s arguments but pursue still different theories for affirmance all their own — ones the district - court never passed upon and the government never pressed. Respectfully, I do not find any of these various and varied efforts to save the district court’s judgment persuasive.
Hi
Most ambitiously, the government suggests that its officers enjoy an irrevocable right to enter a home’s curtilage to conduct a knock and talk. See, e.g., App. Br. at 17 (arguing that, regardless whether a search took place, the knock and talk is “an investigative technique approved by the Supreme Court”). If there were any doubt about its dependence on this theory, the government made it. a special point of emphasis at oral argument. A homeowner may post as many No Trespassing signs as she wishes. She. might add a wall or a medieval-style moat, too. Maybe razor wire and battlements and mantraps besides. Even that isn’t enough to revoke the state’s right -to enter.
In approaching this bold claim it’s important to traverse a little common ground first. The Fourth Amendment, we know, prohibits “unreasonable” searches of particular places and things: “persons, houses, papers, and effects.” U.S. Const. amend. IV. So even if an officer commits a common law trespass when searching your wheat fields, he does not commit a Fourth Amendment violation because the Amendment does not protect “open fields.” Oliver, 466 U.S. at 176, 104 S.Ct. 1735. But the Amendment does speak to “houses” and, as we’ve seen, the Supreme Court has held that term embraces with it the curtilage' surrounding and associated with' the house itself. See Jardines, 133 S.Ct. at 1414. The Court has recognized, too, that a “search” occurs when the government physically enters a constitutionally protected area like a home or its curtilage for investigative purposes. Id. at 1415. An officer approaching your home to return your,lost dog or to solicit for charity may not be conducting a “search” within the meaning of the Fourth Amendment. But one calling to investigate a crime surely is. Neither is. it necessary for officers to bring with them drug sniffing dogs .or thermal imaging technology: they “search” a home’s curtilage simply by entering that constitutionally protected place to obtain information. Of course, “law enforcement officers need not ‘shield their eyes’ when passing by the home ‘on public thoroughfares’” — and they may act on what they see in plain view from the places where they are already lawfully present — but “an officer’s leave to gather information is sharply circumscribed when he steps off those thoroughfares and enters the Fourth Amendment’s protected areas.” Id. (quoting California v. Ciraolo, 476 U.S. 207, 213, 106 S.Ct. 1809, 90 L.Ed.2d 210 (1986)); see also United States v. Jones, — U.S. -, 132 S.Ct. 945, 951 n. 5, 181 L.Ed.2d 911 (2012). The founders understood, too, that a “search” of a constitutionally protected space generally qualifies as “unrea *1005 sonable” when undertaken without a warrant, consent, or an emergency. See Steagald v. United States, 451 U.S. 204, 211, 101 S.Ct. 1642, 68 L.Ed.2d 38 (1981); Georgia v. Randolph, 547 U.S. 103, 143, 126 S.Ct. 1515, 164 L.Ed.2d 208 (2006) (Scalia, J., dissenting); William J. Cuddihy, The Fourth Amendment: Origins and Original Meaning, 602-1791, at 753 (2009).
With this background behind us, it quickly comes clear that most of the conditions necessary to establish a violation of the Fourth Amendment are present here. The government concedes that its officers physically entered the home’s curtilage when (and surely at the very latest) they stepped foot on the front porch in order to reach and knock at the-front door.[1] Neither does the government dispute that the officers entered the curtilage to obtain information. See App. Br. at 17 (acknowledging officers approached the home “with a purpose of discovering information”); see also Jardines, 133 S.Ct. at 1424 (Alito, J., dissenting) (noting that the “purpose of discovering information” is “certainly the objective of a ‘knock and talk’”). And given this, there can be little doubt that the government’s actions constituted a search of a constitutionally protected space. See Jones, 132 S.Ct. at 949 (“The Government physically occupied private property for the purpose of obtaining information. We have no doubt that such a physical intrusion would have been considered a ‘search’ within the meaning of the Fourth Amendment when it was adopted.”). The government acknowledges, too, that it acted without a warrant, exigent circumstances, or the homeowner’s express consent. So it is that everything in this case hinges on the existence of implied consent permitting the officers to enter the home’s curtilage.
Even when it' comes to that question some common ground remains. No one before us disputes that a knocker or doorbell usually amounts to an implied invitation to enter the curtilage, knock or ring at the front door, and seek leave to enter the home itself. Neither do the parties dispute that the homeowner enjoys the right to revoke this implied invitation — at least when it comes.to private visitors — by making it clear to. groups like “the Nation’s Girl Scouts and trick-or-treaters,” Jardines, 133 S.Ct. at 1415, or “solicitors, hawkers and peddlers,” Breard, 341 U.S. at 626, 71 S.Ct. 920, that their presence on the curtilage is unwelcome.
Still, the government says it’s subject to different rules — and it’s here where our dispute really begins. While a homeowner may stop others, from entering his curti-lage, the government contends a homeowner may never stop its agents from entering the curtilage to conduct a knock and talk. Really, then, the government’s argument here isn’t that it enjoys a license or invitation flowing from the homeowner, for it turns out the homeowner has nothing to do with it. In the government’s telling, its agents enjoy a special and irrevocable right to. invade a home’s .curtilage for a knock and talk — what might be more accurately called a sort ’ of permanent easement — whatever , the homeowner may say or do about it.
*1006 This line of reasoning seems to me difficult to reconcile with the Constitution of the founders’ design. We know that the Fourth Amendment, at a minimum, protects the people against searches of their persons, houses, papers, and effects to the same degree the common law protected the people against such things at the time of the founding, for in prohibiting “unreasonable” searches the Amendment incorporated existing common law restrictions on the state’s investigative authority. See Atwater v. City of Lago Vista, 532 U.S. 318, 326-27, 121 S.Ct. 1536, 149 L.Ed.2d 549 (2001). We know, too, that at the time of the founding the common law permitted government agents to enter a home or its curtilage only with the owner’s permission or to execute legal process. No trace of some sort of permanent easement belonging to the state (and state alone) can be found in the common law of the founders’ time.[2] In fact, at common law a homeowner could usually revoke any license to enter his property at his pleasure.[3] And state officials no less than private visitors could be liable for trespass when entering without the homeowner’s consent.[4]
The government disputes none of this apparently dispositive authority. In fact, it doesn’t even address it. Instead, the government replies by pointing (again and only) to the Supreme Court’s observation that officers usually enjoy the homeowner’s implied consent to enter the curti-lage to knock at the front door. See App. Br. at 17 (citing Jardines and King v. Kentucky, 563 U.S. 452, 131 S.Ct. 1849, 179 L.Ed.2d 865 (2011)). But nothing in that prosaic observation purported to upend the original meaning of the Fourth Amendment or centuries of common law recognizing that homeowners may revoke by word or deed the licenses they themselves extend. In fact, the Court in Jar-dines took pains to emphasize that the implied license that might have permitted the officers to enter the curtilage in that case was the same common law license generally enjoyed by private visitors — one entitling the officers to do “no more than any private citizen might.” 133 S.Ct. at 1416 (quoting King, 131 S.Ct. at 1862). If anything, then, Jardines reaffirmed the fact that the implied license on which the knock and talk depends is just that — a license, not a permanent easement, and *1007 one revocable at the homeowner’s pleasure.[5]
The bottom line then is plain. The government has identified no colorable authority and has presented.no plausible argument for its primary theory in this appeal. Not one of the members of this court accepts it. In fact, neither of my colleagues’ opinions even dignifies it with discussion.
If we decline to adopt its main theory on appeal, the government asks us to entertain another alternative ground for affir-mance. Accepting now for argument’s sake that the implied- license to enter the curtilage extends no more to law enforcement agents than it does to other visitors, the government contends that No Trespassing signs aren’t the proper way to revoke it. According to the government, a homeowner may avoid a knock and talk only by hiding in the home and refusing-to answer the door. See App. Br. at 17-18 (relying on language in King indicating that an occupant in a knock and talk has “no obligation to open the door or to speak,” 131 S.Ct. at 1862). Or maybe, as the government seemed to concede at oral argument, by opening the door and commanding officers to leave.
This argument is no more persuasive than the last. Actually, it’s no different from the last. A homeowner who refuses to answer the door, or who opens it to say “go away,” does so after the officers have already entered the home’s front porch and knocked on the door — everything the implied license permits the officers to do. See Jardines, 133 S.Ct. at 1415. In the government’s two scenarios, then, a homeowner hasn’t revoked the license to enter the curtilage and knock at the front door so much as the officers have exhausted the terms of that license. The government’s second argument thus really amounts only to an admission that the implied license has boundaries to its exercise, not an admission that the license may be revoked before its exercise. Indeed, the government’s “new” argument seems just one more way of saying the same old thing— *1008 that homeowners are powerless to prevent the state’s agents from entering their cur-tilage and conducting a knock and talk.
Unsurprisingly, this variation on the theme finds no more of a place in the Constitution than the theme itself. The government points to the Supreme Courts observation in King that a homeowner ip response to a knock and talk may choose to refuse to answer the door or the, questions put tq him. .131 S.Ct. at 1862, But in endorsing that principle the Court hardly suggested that it was denying another— that it meant to deny the homeowner the power to revoke the implied license before visitors reach the front door. In fact and again, Jardines expressly confirmed the ancient rule that, an officer’s implied license to enter the curtilage is no different from a private person’s. And as we’ve seen, that license is clearly revocable when it comes to officers and citizen's alike. See supra at 993.
Notably, my colleagues appear to agree with all this too, for they leave the government’s second alternative theory for affir-mance, like its first, unendorsed — and unmentioned — in their opinions.[6]
#
Rather than reject the government’s two arguments' and call it a day, my colleagues choose to pursue two (more) alternative arguments for affirmance all their own. For its part, the concurrence appears to take the view that No Trespassing signs cannot revoke the implied license in the “residential context” unless they are coupled with a “fence or other physical obstacle,” See Concurrence at 999-1001. True, the concurrence seems to leave open the possibility that signs alone might do their intended work in some (sufficiently) rural setting. See id. at 1000. But a careful look at its reasoning suggests a judgment that signs are categorically insufficient to revoke the implied license in the (undefined) “residential context.” After all, the concurrence says that in the “residential context” plastering a No Trespassing sign to the center of your front door is not “particularly distinctive.” Id. at 1000. Even lining the path from the street to your porch with four (ten? twenty?) signs doesn’t change the equation. Id. According to the concurrence, to revoke the implied license in the “residential context” we .need “special facts” in addition to clearly posted No Trespassing signs — and fences, gates, and “other physical obstacle[S']” are the only “special facts” it identifies. Id. So much is required, we are told, because a sign posted on “a fence encircling a property imparts a different message” than a “sign standing alone.” Id. To be sure, the concurrence doesn’t say what type of “fence or other physical obstacle” might be necessary to inform neighborhood visitors that they’re unwelcome — and you might wonder how a quaint three-foot-high white picket fence might do the trick if twenty No Trespassing signs don’t. But in the concurrence’s judgment it does seem some sort of “fence or other obstacle” is required in the “residential, context” to “clar-if[y] to .the reasonable visitor”, that the license to enter' the curtilage has been revoked. Id.
Respectfully, I have my doubts. Not only did the government fail- to present *1009 this theory anywhere in this appeal, it expressly disavowed it, -telling us repeatedly that walls and fences (yes, even moats) cannot keep its agents’ from entering the curtilage to conduct a knock and talk. And it’s a pretty rare day when we pursue an argument for a party that the party has so avidly disowned. Neither' am I persuaded that the concurrence’s argument is some sort of dead-bang winner the partiés and district court somehow just missed. After all, the concurrence: provides no authority suggesting that some kind of physical obstacle was necessary to revoke the implied license at common law at the time of the Fourth Amendment’s adoption. See Virginia v. Moore, 553 U.S. 164, 168, 128 S.Ct. 1598, 170 L.Ed.2d 559 (2008) (“We look to the statutes and common law of the founding era to determine’ the norms that the Fourth Amendment was meant to preserve.”). And rather than attempt an argument along those lines, the concurrence cites only a handful of contemporary decisions that, even on their own terms, do not support such a view. The first case the concurrence cites stands for the unremarkable proposition that' a single sign on the side of a shed doesn’t unambiguously apply to other portions of the property. See State v. Hiebert, 156 Idaho 637, 329 P.3d 1085, 1090 (App.2014). A second holds that a No Trespassing sign across a closed gate is sufficient to revoke without suggesting that something more than a No Trespassing sign is necessary. See State v. Christensen, 131 Idaho 143, 953 P.2d 583, 587-88 (1998). And the last two cases the concurrence relies upon involve “open fields” doctrine and do nothing to 'suggest a meaningful line between signs and fences. • See Concurrence at 1000. In fact, these latter two cases suggest that signs and fences together are insufficient -undér the Fourth Amendment to prevent the government from searching open fields- for evidence. And that, of course, is because open fields — unlike curtilage — aren’t protected by the Fourth Amendment, not because signs or fences lack force in areas that do fall within the Amendment’s ambit. See Oliver, 466 U.S. at 182, 104 S.Ct. 1, 735 (noting that No Trespassing signs .and fences “may be relevant to Fourth Amendment analysis in some contexts” but “cannot be decisive” for searches of open fields); see also supra at 991.
While the concurrence supplies no authority to support its judgment, there seems to be ample authority running the other way, suggesting that the common law at the time of the -founding did not requiré a property owner to express his intent to revoke a license to enter in any particular way.- Indeed, all that was traditionally required were “express words ... or ... an act ... indicating an intention to revoke.” 3 H. Tiffany, Real Property § 836 (emphasis added); see also supra at 993 (citing additional authorities). Nothing in this common law rule of decision required both notice by word (a sign) and notice by deed (a fence).. -In fact, despite the relatively low literacy rates in mid-18th century England and early America, there appears to be considerable authority suggesting that posted signs or other types of published notice could suffice as a matter of law to ward off .unwanted visitors.[7] What’s more, a great many authori *1010 ties applying the common law’s ancient rule of decision have since recognized the capacity of No Trespassing signs to satisfy it. The Supreme Court in Breard (a decision on which Jardines itself relied) recognized that a homeowner may “bar[ ]” visitors from entering his property to knock at the front door “by notice or order.” 341 U.S. at 626, 71 S.Ct. 920 (emphasis added). And to illustrate the kind of “notice” that will suffice, Breard expressly pointed to a collection of “trespass after warning” statutes endorsing the use of No Trespassing signs.[8] For their part, as well, most state legislatures have adopted laws indicating that entry in the face of conspicuously posted No Trespassing signs will support even criminal trespass actions.[9] And several courts have already specifically held (in conflict with our decision today) that No Trespassing signs like those at issue here can revoke the implied license to enter the curtilage when it comes to lay visitors and police officers alike.[10] In response to this heap of pertinent authority, the concurrence offers no comforting reply-[11]
Instead, in place of authority, the concurrence rests predominantly on certain intuitions about what “reasonable people” think. Attributing to me the view that the posting of a No Trespassing sign “begins *1011 and ends” the Fourth Amendment inquiry, the concurrence argues that there are surely at least some situations in which a “reasonable person would not think a ‘No Trespassing sign revoked the license.” Concurrence at 1001; see also id. at 999 (disputing the proposition that a sign pan revoke the license “in every instance”). But, respectfully, the concurrence here presents a false choice. No one suggests that posting a No Trespassing sign “begins arid ends” the Fourth Amendment inquiry or that a sign will succeed in revoking the implied license “in every instance.” I do not doubt, for example, that often enough a No Trespassing sign — perhaps because of its distant or obscure placement — will fail to provide notice that the implied license to knock on the front door has been revoked. Neither doe's admitting that this straw man should be put to the flame do anything to help us resolve, one way or the other, the question we face in this case: whether multiple and clearly posted signs, along the path to- and on the curtilage itself, can suffice to revoke the implied license without resort to fences or other obstacles.
When the concurrence reaches this question, it offers a different intuition. The concurrence suggests that “reasonable person[s]” do not consider No Trespassing signs, absent a fence or other obstacle, as speaking to the implied license to enter in the “residential context.” In the concurrence’s judgment, most people know that it’s illegal to “trespass” on private property, and they also know that it generally isn’t “trespassing” to walk up to the front door of a house and knock. So, the reasoning appears to go, “reasonable persons” visiting a residential neighborhood understand the particular words “no. trespassing” to refer to conduct other than the exercise of the implied license. Id. at 999-1000.
This intuitive appeal, though, seems to invite further, problems of its own. .First, as a matter of law, it disregards the common law rule of decision at the time of the founding and its many applications, then and now, suggesting that posted notice can suffice to warn off “reasonable” visitors. The Fourth Amendment is, after all, supposed to protect the people at least as much now as it did when adopted, its ancient protections still in force whatever our current intuitions or preferences might be. See supra at 996-98. Second, as a matter of fact, you can’t help but wonder if millions of homeowners (and solicitors) might l)e surprised to learn -that even a long line of clearly posted No Trespassing signs are insufficient to revoke the implied license to enter a home’s curtilage — that No Trespassing signs have become little more than lawn art. Certainly the concurrence offers no evidence to support its intuition about social customs and the opposite intuition seems no less and maybe a good deal more defensible, especially in light of our common law heritage. Third, as a matter of logic, even on its own terms the concurrence’s argument fails to sustain the conclusion that fences or other obstacles are necessary to revoke the implied license in the residential setting. Consider. If a single No Trespassing sign communicates only the already obvious fact that trespassing isn’t permitted and says nothing that might be reasonably interpreted as revoking the implied license, how does the addition of a fence transform the message so drastically, as the concurrence supposes? And if adding a fence does transform the meaning of a single No Trespassing sign, then why can’t a large number of signs, collectively and strategically placed, have the same effect? The concurrence simply doesn’t say. Along similar lines, if, as the concurrence suggests, No Trespassing signs cannot revoke the implied. license because they use the word “trespassing” and that term has be *1012 come encrusted with a very particular meaning that just doesn’t speak to the implied license, what about Signs that avoid the term and say instead Keep Out? Keep Off? Do Not Enter?' Or how about this?
THE IMPLIED LICENSE DISCUSSED BY THE UNITED STATES SUPREME COURT IN BREARD v. ALEXANDRIA, 341 U.S. 622 (1951) AND FLORIDA v. JARDINES, 133 S.Ct. 1409, 185 L.Ed.2d 495 (2013) IS HEREBY. REVOKED
Respectfully, the concurrence’s argument doesn’t seem to suggest a rule requiring fences or other obstacles so much ás a reason for differentiating between the precise text found on signs — in a way no statute or case I’ve found has seen fit to do — and simply avoiding the word “trespass” and its variants. And if that’s the case, you have to wonder if following the cohcurrence’s lead would do no more than invite' a new cottage industry, one spitting out lawn signs with long and lawyerly (and no doubt less intuitive and eommonsensical) messages instead of the tried and true “No Trespassing.”'
*
The, majority opinion — the only opinion to garner two votes in this case — offers yet another alternative theory for affirmance. It. doesn’t adopt the concurrence’s suggestion that No Trespassing signs are categorically insufficient to revoke the implied license in a residential setting. Instead, the majority , opinion seems to accept the possibility that signs can revoke the license in that setting, or any other and presents a much more fact-bound argument about the insufficiency of the particular signs in this case.[12] Respectfully, *1013 though, the majority opinion’s -alternative theory for affirmance is another one the district court never passed upon and the government never presented. Neither, again, is the argument so obviously correct that I believe we might confidently dispense with the adversarial process and adopt it without bothering to hear from the parties or district court.
Addressing' the three signs leading to the front porch, the majority opinion begins by noting that they were posted on ground leading to the curtilage rather than on the curtilage itself. And this fact, it suggests, means a reasonable visitor wouldn’t have understood them to forbid entry into the curtilage. See Maj. Op. at 995-96. But it’s unclear why that conclusion follows from these facts. All three signs lined the path any visitor would follow (and the path the officers did follow) to reach the curtilage and front door. The signs came one upon the other, hard and in short order, and near the bounds of the curtilage itself.. All were clearly visible and clearly unwelcoming. And from this it’s difficult to see how a reasonable visitor could have felt at liberty to venture into the curtilage. Especially when, as we’ve seen, Breará and a long line of cases have found similar signs sufficient to revoke-the implied license in similar circumstances. See supra at 996-98. The majority opinion creates a conflict with these authorities but discusses none of them. And, like thé concurrence, the only cases it does ‘cite stand simply for the proposition that the Fourth Amendment is inapplicable to open fields, see Maj. Op. at 995-96, a proposition that’s beside the point when we’re faced with intrusions into constitutionally protected curtilage, see supra at 991, 996: Neither, in all events, does the majority opinion’s logic suffice to dispose of this case because at least one sign was undeniably on curtilage and' clearly visible to those preparing to enter it.
.To be sure, the majority opinion finds this last sign insufficient, too, if for a different reason.. The majority suggests that the- terms of this particular sign were too ambiguous. Maj. Op. at 996-97. But in large bold letters the sign said this:
POSTED
PRIVATE PROPERTY HUNTING, FISHING, TRAPPING, OR TRESPASSING FOR ANY PURPOSE IS STRICTLY FORBIDDEN VIOLATORS WILL BE PROSECUTED
The majority opinion emphasizes the sign’s discussion of hunting, fishing, and trapping, and notes that those activities don’t usually take place on a front porch. From this, the majority’opinion reasons, the sign could have been reasonably interpreted by a visitor 'as forbidding him only frotti engaging in these recreational activities elsewhere on the property and not as speaking to his entry into the' curtilage where the sign was posted. Id. at 997. But here again the majority opinion does not address the contrary tide of authority from’ Breará arid beyond. See supra at 997-98. And even overlookirig that problem, I would have thought it equally (of maybe even a good deal more) likely that a reasoriable person — considering whether to enter a stranger’s front porch and staring at a large “PRIVATE PROPERTY” *1014 sign forbidding “TRESPASSING FOR ANY PURPOSE” — would take it as directed at him and his activities rather than as directed only at someone interested in hunting or fishing somewhere else on the property. Especially after Jardines and Breard described the implied license to enter curtilage and knock at the front door as derived in part from the ubiquitous “knocker on the front door” and here (literally) a No Trespassing sign hung in its place. And especially when there’s no evidence in the record that any hunting, fishing, or trapping took place in the yard of this home in the middle of town along a paved street. We do seem to invite quite a paradox when we suggest the first three signs are irrelevant to curtilage because they were not posted on curtilage and yet treat the final sign as irrelevant to curti-lage even though it was. And a paradox, too, when we suggest that a homeowner who posts a sign containing additional and illustrative warnings (about hunting, fishing, and trapping) should forgo the force of its central and express warning (no trespassing for any purpose).
Having said this much,.I do appreciate the limits of the majority opinion’s message. The sole controlling opinion in this case doesn’t suggest that No Trespassing signs are categorically insufficient to revoke the implied license but suggests only that homeowners should be more punctilious with their choice and placement of signs than the homeowner here. Indeed, I understand the majority opinion as strongly implying that No Trespassing signs will do their job so long as they (1) are placed visibly on the curtilage itself and (2) don’t contain surplus language about hunting and trapping. That much may invite a new chapter of cases forced to make fine judgments about the placement and content of signs. But it does not suggest that plain, simple, and appropriately placed No Trespassing signs are insufficient to revoke the implied license.
Besides those arguments my colleagues advance for the government, I can imagine still others the government might have pursued but didn’t. For example, I don’t doubt that an unlicensed entry into a home’s curtilage can be licensed after the fact. Sometimes visitors take their chances in the face of a clear warning— sometimes they defy No Trespassing signs and hope the homeowner will welcome them after all. And sometimes homeowners do, effectively affording the visitor a retroactive license. Maybe the government could have argued that its initially nonconsensual search in this case became a consensual and reasonable one thanks to the homeowner’s after-the-fact consent. Maybe the government could successfully pursue just this tack in a good many knock and talk cases. Cf. Cutler v. Smith, 57 Ill. 252, 255 (1870) (affirming that “if defendant went to plaintiffs house to see her on business, and was allowed to enter, or did enter without force, this would be deemed a license”); 3 H. Tiffany, Real Property § 830 & n.24 (citing Cutler and other cases). But in this appeal the government expressly concedes that, if the officers violated the Fourth Amendment by entering the curtilage, any “subsequent consent” to the officers’ presence in this case was insufficient “to purge any taint of the Fourth Amendment violation.” App. Br. at 28; id. at 10.[13] Along similar but different lines, I *1015 can imagine the government arguing that even if a Fourth Amendment violation took place here, it acted at most negligently and in good faith so that as a matter of remedy suppression should not follow. See Herring v. United States, 555 U.S. 135, 147-48, 129 S.Ct. 695, 172 L.Ed.2d 496 (2009). But, again, the government makes no effort to pursue that kind of argument in this appeal. When it comes to these alternative grounds for affirmance, my colleagues decline to pursue arguments that the government failed to pursue for itself — and here I fully concur with their decision.
$
Whether in arguing that the state enjoys an irrevocable license to enter or in suggesting that No Trespassing signs are categorically insufficient to bar its agents, the government appears to be moved by the same worry: that if clearly posted No Trespassing signs can revoke the right of officers to enter a home’s curtilage their job of ferreting out crime will become marginally more difficult. But obedience to the Fourth Amendment always bears that cost and surely brings with it other benefits. Neither, of course, is it our job to weigh those costs and benefits but to apply the Amendment according to its terms and in light of its historical meaning. Besides, it is hardly the case that following the Fourth Amendment’s teachings would leave the government as bereft of lawful alternatives as it seems to' suppose. The Amendment and the common law from which it was constructed leave ample room for law enforcement to do its job. A warrant will always do. So will emergency circumstances. After-the-fact consent may suffice if freely given. And, of course, there’s no need for consent when officers search only open fields rather than curti-lage. Neither is there need for consent when officers enter curtilage for a non-investigative purpose. .Our duty of fidelity to the law requires us to respect all these law enforcement tools. But it also requires us to respect the ancient rights of the people when law enforcement exceeds their limits. In this case the two arguments the government offers to justify its conduct can claim no basis in our constitutional tradition. Not one member of this panel endorses them. And, respectfully, I just do not see the case for struggling so mightily to save the government’s cause with arguments of our own devise — especially when what árguments we are able to muster suffer so many problems of their own and the benefits of exposing them to at least a modest encounter with the adversarial process seem so obvious.
Respectfully, I dissent.

. At common law the curtilage was far more expansive than the front porch, sometimes said to reach as far as an English longbow shot — some 200 yards — from the dwelling house. See 1 Matthew Hale, Historia Placito-rum Coronae 559 (1st American ed. 1847) (1736); Eric Dean Bender, Note, The Fourth Amendment in the Age of Aerial Surveillance: Curtains for the Curtilage, 60 N.Y.U. L. Rev. 725, 733 & n.44 (1985). But even spotting (without granting) the government its crabbed view of curtilage in this case, there’s no dispute it had to enter the homeowner's curtilage in' order to reach and knock at the front door.

. See 3 William Blackstone, Commentaries *209, *212-14 (listing implied rights to enter without suggesting any special implied right belonged to the state); see also Jardines, 133 S.Ct. at 1415; Entick v. Carrington, (1765) 95 Eng. Rep. 807, 817; 2 Wils. K.B. 275, 291 ("[I]f this [wa]s law it would be found in our books.... ”); Thomas Y. Davies, Recovering the Original Fourth Amendment, 98 Mich. L. Rev. 547, 646 n.273 (1999) ("[C]ommon-law sources tended to define lawful authority positively and to catalog the forms of authority that existed; as a general matter, the absence of an affirmative statement of authority was understood to mean there was no authority.”); id. at 624 & n.203.

. See, e.g., 3 H. Tiffany, Real Property § 833 (3d ed.); id. §§ 834-35 (noting inapplicable exceptions); Restatement (Second) of Torts § 171 (1965); James W. Ely, Jr. & Jon W. Bruce, The Law of Easements and Licenses in Land § 11:6.

. See generally Turner v. Sheriff of Marion Cty., 94 F.Supp.2d 966, 984 (S.D.Ind.2000); Voskerchian v. United States, No. 98-CV-0335E(M), 1999 WL 66709, at *4 (W.D.N.Y. Feb. 10, 1999); see also Minnesota v. Carter, 525 U.S. 83, 101, 119 S.Ct. 469, 142 L.Ed.2d 373 (1998) (Kennedy, J., concurring); Walker v. City of Denver, 720 P.2d 619, 623-24 (Colo.App.1986); Loe v. Whitman, 107 So.2d 536, 539-41 (La.Ct.App.1958); Moore v. Duke, 84 Vt. 401, 80 A. 194, 196 (1911); State ex rel. McPheron v. Beckner, 132 Ind. 371, 31 N.E. 950, 951 (1892); Grumon v. Raymond, 1 Conn. 40, 45-47 (1814); Entick, 95 Eng. Rep. at 817; Craddock v. Erving (Mass. Super. Ct. 1761) (cited in Cuddihy, supra, at 595 & n.81).

. The only other case the government has cited in support of its theory (and cited only in oral argument) offers no reason to doubt any of this. In United States v. Denim, No. 2:13-CR-63, 2013 WL 4591469 (E.D.Tenn. Aug. 28, 2013), a magistrate did suggest that the government should enjoy an irrevocable license to enter curtilage and conduct a knock and talk. But like the government here, the magistrate there didn’t address the original meaning of the Fourth Amendment, Instead, the court endorsed the rule the government proposes on the strength of a hypothetical in which the police seek to investigate "an anonymous complaint that a child' [is] being abused on that property,” suggesting that surely entry in these circumstances would be important and good. Id. at *5. Respectfully, though, this seems at least as much a policy argument as a legal one — and one that fails even on its own terms. Credible allegations of ongoing child abuse, after all, would qualify as exigent circumstances or support a warrant's issuance and thus permit entry ipto the home, let alone the curtilage, without the need for any new and irrevocable law enforcement license. Seeming to recognize this much, the magistrate in Denim proceeded to suggest, in the alternative, that the nature of the crime being investigated shouldn’t matter, Even a wish to investigate the loss of stolen goods, without sufficient evidence to support a warrant or exigent circumstances, should be enough to permit authorities to enter curti-lage whenever they yvish because “[a] crime is a crime.” Id. But under this logic officers would be entitled to enter a home’s curtilage (why not the home too?) so long as probable cause (or maybe just reasonable suspicion?) exists to support the investigation of any crime (even a misdemeanor?). And that, of course, would effectively undo the founders’ ■ and the Supreme Court's understanding that under our Fourth Amendment a home and its curtilage are generally searchable only with a warrant, exigent circumstances, or valid consent.

. The government’s brief does fleetingly allude to a third alternative theory for affir-mance, but it is a good deal less plausible still and can be resolved quickly. The government suggests that the horneowner in our case didn’t subjectively intend for her No Trespassing signs to exclude the police from investigating crimes on her property. And yet there’s no evidence this intention was ever communicated to the police and — as the majority opinion rightly notes — the scope of the implied license cannot be measured by what the homeowner secretly and subjectively intended but must be measured by what an objective visitor would have perceived. See Maj. Op. at 994 n.5.

, See 2 Blackstone, supra, at *214 ("Every trespass is wilful, where the defendant has notice, and is especially forewarned not to come on the land.”); Reynold v. Edwards, (1794) 101 Eng. Rep. 408 (K.B.); 6 T.R. 11 (certifying a “wilful” trespass where landowner had given "general notice to all persons not to trespass on his lands”); see also Edward Christian, A Treatise on the Game Laws 96 (1817) (explaining that "[njotice by a board” was sufficient to warn against trespass "if it could be proved that the defendant had read it”); Thomas A. Lund, Early American Wildlife Law, 51 N.Y.U. L.Rev. 703, 712-13 (1976) (describing the "presumption” in some *1010 early American jurisdictions that the absence of "posted notices” on unenclosed land was an invitation to hunt or fish).

. See Breard, 341 U.S. at 626 n. 2, 71 S.Ct. 920 (citing "statutes collected” in Martin v. City of Struthers, 319 U.S. 141, 147 n. 10, 63 S.Ct. 862, 87 L.Ed. 1313 (1943)); see also, e.g,, Conn. Gen.Stat. § 6119 (1930) (entry prohibited by “clear and legible signs posted”); Md.Ann.Code, Art. 27, §§ 24, 286 (1939) (property "posted against trespassers in a conspicuous manner”); Nev. Comp. Laws § 10447 (1929) (land posted with "signs legibly printed or painted in the English language, warning persons not to trespass”); Pa. Arm. Stat. § 4954 (1942) (land "prominently posted with printed notices that said land is private property, and warning all persons from trespassing thereon”).

. See, e.g., Okla. Stat. Ann. tit. 21, § 1835 (2015) (permitting the use of "PROPERTY RESTRICTED,” "POSTED — KEEP OUT,” "KEEP OUT,” "NO TRESPASSING” or other "similar signs"); 3 W. LaFave, Subst. Crim. L. § 21.2 (2d ed.) (collecting state statutes). Such laws parallel the "wilful” trespass of Blackstone’s day. When a judge certified a trespass as "wilful” due to "notice,” the landowner could recover full costs. 2 Blackstone, supra, at *214.

. See, e.g., United States v. Clarkson, No. L13-CR-44, 2015 WL 328350, at *4 (E.D.Tenn. Jan. 26, 2015) ("A police officer may ... approach the front door to a residence to knock and ask questions provided the resident has not attempted to block access to the front door or taken other significant measures, such as ‘No Trespassing’ signs, to maintain his privacy.”); Powell v. State, 120 So.3d 577, 584 (Fla.Dist.Ct.App.2013) ("The existence and extent of a license that would permit a- 'knock and talk' depends on the circumstances; homeowners who. post ‘No Trespassing’ or ‘No Soliciting’ signs effectively negate a license to enter the posted property.”); Commonwealth v. Ousley, 393 S.W.3d 15, 29 (Ky.2013) ("[Jjust as a private salesperson — absent no-solicitation signs, no-trespass signs, etc, — has implicit permission to approach the house to conduct business with the inhabitants, so too do the police.”); State v. Blackwell, No. E2009-00043-CCA-R3-CD, 2010 WL 454864, at *7 (Tenn.Crim.App. Feb. 10, 2010) ("Clearly, the presence of the 'No Trespassing’ sign evinced ... a revocation of the ‘implied invitation’ of the front door.”).

.The concurrence simply observes that contemporary state laws do’ not determine the contours of the Fourth Amendment’s original meaning. See Concurrence at 1000. But, respectfully, no one has suggested they do. I’ve merely observed here that, at the time of the ' founding, the common law rule of decision for determining whether a license to enter had been revoked turned on the existence of notice, without regard to form. And I have observed that a good many authorities, both then and since, have recognized an unsurprising application of that rule of decision — that posted signs can supply notice.

. Before procéeding to this narrower and case-specific argument, the majority opinion does- seem to intimate that there may be something to the concurrence’s more categorical approach, and even proceeds to cite authorities that, it suggests, might support the position. See Maj. Op. at 995. But, once again, not one of these authorities turns out to endorse the notion, that No Trespassing signs are categorically insufficient to revoke the implied license. See, e.g., State v. Christensen, No. W2014-00931-CCA-R3-CD, 2015 WL 2330185, at *1, *8 (Tenn.Crim.App. May 14, 2015), appeal granted (Term. July 14, 2015) (finding only that a single “small sign” that was "difficult to see,” posted in a field next to a long, rural driveway, was insufficient to revoke); United States v. Lubrin, No. CR-2014-0056, 2015 WL 361796, at *6 & n. 7 (D.Vi. Jan. 28, 2015) (finding only that a "partial sign” on the comer of the property, far from the point of entry, was insufficient to revoke); Hiebert, 329 P.3d at 1091 (finding only that a single "small sign” on the side' of a shed did not unambiguously apply to other portions of the property). I recognize that in United States v. Jones, No. 4:13CR00011-003, 2013 WL 4678229 (W.D.Va. Aug. 30, 2013), the district court did conclude that "the existence and volume of ‘No Trespassing’ signs is not dispositive” of the Fourth Amendment question, serving only as evidence of the homeowner’s "desire for privacy.” Id. at *9. But not only did the court in Jones fail to grapple with the swathe of authority and argument discussed above, it stressed that when the officers approached the home — contrary to the facts here — the defendant "was unknown to them and was not the subject of a criminal investigation,” thus leaving open the possibility that no search occurred that might trigger the Fourth Amendment in the first place. Id. at *7. The other cases the majority opinion cites address different questions altogether. See, e.g., United States v. Bearden, 780 F.3d 887, 893 (8th Cir.2015) (rejecting defendant's argument that officers had passed a No Trespassing sign because the district court's contrary factual finding was not clearly erroneous); Covey v. Assessor of Ohio Cty., 777 F.3d 186, 192-94 (4th Cir.2015) (holding that officers exceeded the scope of the implied license without addressing the issue of revocation); Pache v. State, 413 S.W.3d 509, 511-12 (Tex.App.2013) (discussing defendant testimony about the presence of a No Trespassing sign with no finding or analysis of its effect on the implied license); City of Beatrice v. Meints, 289 Neb. 558, 856 N.W.2d 410, 420-21 (2014) (addressing entry into “urban lot” *1013 that had "no residence” and was thus an "open field”); Hollaran v. Duncan, 92 F.Supp.3d 774, 787-88 (W.D.Tenn.2015) (addressing entry into wooded area that was an “open field”); Davis v. City of Milwaukee, No. 13-CV-982-JPS, 2015 WL 5010459, at *8-13 (E.D.Wis. Aug. 21, 2015) (addressing whether it was "clearly established” that an administrative search of property surrounding an abandoned house in which the plaintiff had . never lived violated the Fourth Amendment for purposes of qualified immunity).

. On page 19 of its brief the government does suggest that Mr. Carloss "impliedly consented” to the officers’ presence by failing to invoke the No Trespassing signs during their visit. But the government cites no legal authority, and it leaves the argument undeveloped as it quickly passes on to other things. When the government returns to the issue on page 28 it clearly concedes that if the officers violated the Fourth Amendment by trespassing onto the curtilage, Mr. Carloss’s "subsequent consent is not remote enough” to purge the Fourth Amendment violation, seeming to *1015 concede the very argument it alluded to in passing nine pages earlier. In these circumstances, my colleagues are entirely correct to decline to pass on the argument..